1    **WO**

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                        FOR THE DISTRICT OF ARIZONA

9

10   In re:                                )   No. CV 05-2045-PHX-JAT
                                           )
11   Michael  Keith  Schugg,  dba  Schuburg)   **FINDINGS OF FACT AND**
     Holsteins,                            )   **CONCLUSIONS OF LAW**
12                                         )
             Debtor.                       )   BK No. 2-04-13226-PHX-GBN
13   _____)   BK No. 2-04-19091-PHX-GBN
     In re:                                )
14                                         )   ADV. No. 2-05-ap-00384-GBN
     Debra Schugg,                         )
15                                         )
             Debtor.                       )
16   _____)
                                           )
17   G. Grant Lyon, in his capacity as Chapter)
     11  Trustee  of  the  bankruptcy  estate  of)
18   Michael Keith Schugg and Debra Schugg;)
     Wells Fargo Bank, N.A.,               )
19                                         )
             Plaintiffs,                    )
20                                         )
     vs.                                   )
21                                         )
     Gila River Indian Community,          )
22                                         )
             Defendant.                     )
23   _____)

24          On September 18, 19, 20, 25, 26, 27, and 28, 2007, the Court presided over a bench

25   trial in this matter.  In the Final Pretrial Order (Doc. # 239), G. Grant Lyon, the Chapter 11

26   trustee of the consolidated estates of Michael Keith Schugg and Debra Schugg, and the Gila

27   River Indian Community set forth approximately forty-five (45) issues of fact and law to be

28   tried and determined.  Generally, the issues can be summarized as follows: (1) whether there

is an easement or right-of-way via Smith-Enke Road or Murphy Road for access and utilities to Section 16 of Township 4 South Range 4 East in Pinal County ("Section 16"); (2) whether Murphy Road is an Indian Reservation Road that must remain open for public use; (3) whether Smith-Enke Road and/or Murphy Road are public rights-of-way under R.S. 2477 that must remain open for public use; (4) whether the easement and/or right-of-way access (if any) to Section 16 includes the right to improve the easements or install additional utilities thereon; (5) whether GRIC has the power to regulate zoning on Section 16; and (6) whether the Trustee, the Debtors, representatives of the S & T Dairy and/or their respective invitees, employees, assignees, agents or representatives have trespassed on tribal or allotted lands within the Gila River Indian Community's reservation.  Following the bench trial, the Court hereby finds and concludes as follows:

**I.    Findings of Fact**

**<u>Introduction</u>**

1.    This action was filed by G. Grant Lyon acting solely in his capacity as Chapter 11 Trustee of the bankruptcy estate of Michael Keith Schugg and Debra Schugg (the "Trustee").

2.    The Defendant/Counter-Plaintiff Gila River Indian Community ("GRIC") is a federally-recognized Indian Community organized under Section 16 of the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.*

3.    GRIC is based on the Gila River Indian Reservation (the "Reservation"), which consists of approximately 372,000 acres in south-central Arizona, and includes members of the federally-recognized Akmil O'odham ("Pima") and Peeposh ("Maricopa") Tribes.

4.    In or about September 2003, Michael Schugg and Debra Schugg (the "Debtors") acquired title to land known as Section 16 of Township 4 South, Range 4 East in Pinal County, Arizona, comprising approximately 657 acres ("Section 16").

5.    On May 22, 2006, the Bankruptcy Court entered an order directing the Trustee to pay Wells Fargo's principal and interest in full.

6.     On March 12, 2007, Wells Fargo, N.A., released its lien on Section 16.

7.     On June 1, 2007, all claims and counterclaims between Wells Fargo and GRIC were dismissed with prejudice, resulting in the dismissal of Wells Fargo from this case.

**Indispensable Party**

8.     On March 9, 2006, the Court denied without prejudice GRIC's Motion to Dismiss, in which GRIC argued, *inter alia*, that the United States is an indispensable party.

9.     Before the trial of this matter, GRIC filed a brief entitled Gila River Indian Community's Trial Brief Regarding the Lack of Jurisdiction Over the Trustee's Access Claims Due to the Fact that the United States Is an Indispensable Party (Doc. # 218).

10.    In response, the Trustee filed a Memorandum Regarding the United States Not Being an Indispensable Party to Legal Access Claims (Doc. # 225).

11.    On January 8, 2008, the Court ordered the parties to file supplemental briefs to address the fact that Smith-Enke Road and Murphy Road cross land owned by or allotted to individuals not made parties to this litigation and the impact thereof on the analysis under Rule 19 of the Federal Rules of Civil Procedure.

12.    On January 11, 2008, both parties filed their respective briefs.

13.    There is no pending motion to dismiss for failure to join a party under Rule 19 of the Federal Rules of Civil Procedure.

**Uncontested History of Section 16 and the Gila River Indian Reservation**

14.    In 1850, the United States Government reserved all sections numbered sixteen and thirty-six in each township of the Territory of New Mexico for the purpose of being applied to schools.

15.    In 1853, the United States acquired land that later became part of the State of Arizona through the Gadsden Purchase, including land that was later designated as Section 16.

16.    In 1854, the United States promulgated the Law of July 23, 1854, § 5, which stated, in part: "sections numbered sixteen and thirty-six in each township, in said Territory, shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be created out of the

1    same."

2    17.   In 1863, Congress partitioned the Territory of New Mexico to create the Territory of

3          Arizona.

4    18.   In 1876, a survey of the Territory of Arizona, which included Section 16, was

5          conducted by Theodore White, a United States Deputy Surveyor for Arizona.  The

6          survey was filed with the Surveyor General's Office in Tucson, Arizona, the following

7          year.

8    19.   In 1921, a resurvey of certain parcels surrounding Section 16 was filed.

9    20.   In 1910, Congress authorized Arizona's statehood by passing the Enabling Act.

10   21.   Arizona became a state on February 14, 1912.

11   22.   In 1859, Congress created a reservation for the confederated bands of Pima and

12         Maricopa Indians by enacting sections 3 and 4 of the Act of February 28, 1859, ch.

13         66, 11 Stat. 388, 401.

14   23.   After 1859, the Reservation's boundaries were revised by seven Executive Orders

15         issued between 1876 and 1915, resulting in its current size of approximately 372,000

16         acres.

17   24.   The land contiguous to Section 16 was added to the Reservation by two Executive

18         Orders: one dated November 15, 1883 (adding the land immediately north of Section

19         16) and the other dated June 2, 1913 (adding the land immediately to the south, east

20         and west of Section 16).

21   25.   The Executive Orders that expanded the Reservation lands did not identify any

22         specific easements providing legal access to Section 16.

23   26.   The 1883 Executive Order, which added to the Reservation land immediately north

24         of Section 16, stated in part:

25                 [A]ny tract or tracts of lands included within the foregoing-
                  described boundaries [added to the Reservation] the title of
26                which has passed out of the United States Government, or to
                  which valid homestead or pre-emption rights have attached
27                under the laws of the United States prior to the date of this
                  order, are hereby excluded from the reservation hereby made.

28

27.   The 1913 Executive Order, which added to the Reservation land south, east and west of Section 16 (hereinafter referred to as the "Encircling Strip"), stated that the lands "shall be subject to any existing valid rights of any persons to the lands described."

28.   The land surrounding Section 16 includes allotments for individual Indians and GRIC.

29.   Allotment Deeds for certain allotments in the vicinity of Section 16 were issued in 1921.

30.   The Allotment Deeds state that the federal government will hold the land in trust for twenty-five years for the sole use and benefit of the Indian, and when the period expires "the United States will convey the same by patent to said Indian in fee, discharged of said trust and free from all charge and encumbrance whatsoever."

31.   On November 1, 1929, the State of Arizona transferred Section 16 to J. L. Hodges by a patent conveying fee simple ownership "with all the rights, privileges, immunities, and appurtenances of whatsoever nature" and "subject to any and all easements or rights of way heretofore legally obtained."

32.   On January 11, 1944, Mr. Hodges and Grace Atkins Hodges conveyed to H.G. Tiffany and Virginia Tiffany, Frances H. Raymond, and Walter H. Coleman and Pearl F. Coleman title to Section 16 by warranty deed "together with all and singular the rights and appurtenances thereto in anywise belonging unto the said GRANTEES." The warranty deed did not otherwise identify any easement across Indian lands to Section 16.

33.   On March 7, 1946, Mr. and Mrs. Tiffany, Ms. Raymond, and Mr. and Mrs. Coleman conveyed to Charles and Lena Hill title to Section 16 by warranty deed "together with all and singular the rights and appurtenances thereto in anywise belonging unto the said GRANTEES."  The warranty deed did not otherwise identify any easement across Indian lands to Section 16.

34.   On July 19, 2001, Wells Fargo loaned S & T Dairy $500,000 to help purchase Section 16 in exchange for a deed of trust on the property.

35.   By warranty deed recorded in Pinal County on July 26, 2001, Charles A. Hill, a

descendant of Charles Hill and general partner of Hill Farms, Ltd., an Arizona limited partnership, conveyed to S & T Dairy, L.L.C., an Arizona limited liability company ("S & T Dairy"), title to Section 16 "together with all rights and privileges thereto." The warranty deed did not otherwise identify any easement across Indian lands to Section 16.

36.    In June 2001, Michael Schugg and Charles Hill entered into an agreement under which S & T Dairy, a company owned by Stacey and Travis Schugg, Mr. Schugg's children, purchased fee simple title to Section 16 for $1.6 million.

37.    On behalf of S & T Dairy, Michael Schugg signed a contract for the purchase of Section 16, an addendum to which stated:

> The Hill Farm is located within the boundary of the Reservation and access to the property may be restricted. The Seller does not warrant or guarantee access or right-of-ways or easements for access or utilities. The Buyer (Mr. Michael Schugg) has personally researched access to the property and has visited with the Bureau of Indian Affairs and is satisfied with the current access to the property. Mr. Schugg and/or heirs acknowledge the limited access and potential problems of being located with [sic] the Boundary of the Reservation and they will hold the Seller and Broker (Aztec Agricultural Group, Inc. - Melvin D. Young, Broker) harmless for any potential liability or cost that may be incurred due to the location/access of the property.

38.    In 2001, S & T Dairy constructed a dairy on Section 16.

39.    Construction of the dairy lasted from August 2001 to approximately March 2003 and cost approximately $9 million.

40.    On June 10, 2002, Wells Fargo loaned S & T Dairy $4 million to construct the dairy on Section 16 and obtained a deed of trust and assignment of rents and leases on the property.

41.    On April 29, 2003, Wells Fargo increased the value of its deed of trust on Section 16 for granting S & T Dairy a $500,000 line of credit on a "Term Note," a $3.3 million line of credit on a "Herd Note," and an $800,000 line of credit on a "Feed Note."

42.    In or about September 2003, S & T Dairy conveyed to the Debtors title to Section 16 "together with all rights, easements, benefits and privileges appurtenant to the Subject

1   Real Property on the Effective Date."   The document transferring title did not

2   otherwise identify any easement across Indian lands to Section 16.

3   43.   On March 22, 2004, the Debtors fully assumed the obligations of S & T Dairy

4   described in the April 29, 2003, Amended and Restated Deed of Trust.

5   **Access to Section 16**

6   44.   Section 16 is located wholly within the Reservation.   On the north, Section 16 is

7   bordered by Reservation land that includes allotments for individual Indians and

8   GRIC.   On the south, east and west, Section 16 is bordered by the Encircling Strip,

9   an approximately one-half mile strip of Reservation land that includes allotments for

10   individual Indians and GRIC.

11   45.   Smith-Enke Road and Murphy Road provide physical access to Section 16.

12   46.   Smith-Enke Road is an east-west road that runs adjacent to the southern boundary of

13   Section 16.

14   47.   Traveling west from Section 16, Smith-Enke Road crosses the Encircling Strip for

15   approximately one-half mile and continues to the city of Maricopa, which is outside

16   the boundaries of the Reservation.

17   48.   Traveling east from Section 16, Smith-Enke Road extends to the city of Sacaton,

18   although at some point east of Section 16 the name of the road changes to Seed Farm

19   Road.

20   49.   Smith-Enke Road abuts or crosses tribal land and land allotted to individual Indians

21   within the Reservation boundaries.

22   50.   Murphy Road is a north-south road that runs adjacent to the eastern boundary of

23   Section 16.  Murphy Road intersects with Casa Blanca Road approximately two miles

24   north of Section 16.

25   51.   Traveling south from Section 16, Murphy Road crosses the approximately one-half

26   mile wide Encircling Strip and continues at least to the city of Maricopa.

27   52.   Traveling north from Section 16 for approximately two miles, Murphy Road

28   intersects with Casa Blanca Road.

53. Casa Blanca Road is a road running east and west approximately two miles north of the northern boundary of Section 16.

54. Murphy Road abuts or crosses tribal land and land allotted to individual Indians within the Reservation.

55. Pinal County maintained Murphy Road from Smith-Enke Road south to the Reservation's southern boundary from at least 1996 to at least 2001.  The maintenance occurred once every two or three months.

56. Pinal County maintained Smith-Enke Road from Murphy Road west to Hartman Road (which road runs along the western boundary of Section 16), and sometimes farther west to the University of Arizona agricultural farm land, from at least 1996 to at least 2001.  The maintenance occurred once every two to three months.

57. Pinal County no longer maintains the portions of Smith-Enke Road or Murphy Road within the Reservation's boundaries.

58. The BIA was responsible for maintaining Murphy Road from Casa Blanca Road south to the Reservation's southern boundary until the mid-1990's, at which time GRIC contracted with the BIA to assume maintenance of the BIA roads on the Reservation.

59. Federal funds have been used to maintain Smith-Enke Road and Murphy Road.

60. Beginning in 2000, GRIC maintained Murphy Road from Casa Blanca Road south to the Reservation's southern boundary.

61. Approximately one year before trial, GRIC terminated its maintenance of Murphy Road from Casa Blanca Road south to the Reservation's southern boundary because neither GRIC nor the BIA has a legal right-of-way on that portion of road.

62. For decades, the owners of Section 16 and other members of the public traveled across the Encircling Strip via Smith-Enke Road and Murphy Road without GRIC's objection.

63. Trucks used Smith-Enke Road and Murphy Road to complete the dairy construction project.

64. After the dairy was constructed, trucks used Smith-Enke Road and Murphy Road to

1    pick up loads of milk and to deliver feed for the dairy cattle.

2    65.    GRIC did not object to the construction of the dairy on Section 16 or travel to and

3    from Section 16 until 2003 or 2004.

4    66.    Portions of Section 16 have been farmed since at least the 1940s.

5    67.    Dirt wagon trails were the primary roadways in south-central Arizona in the 1800's

6    and early 1900's.

7    68.    In 1875, there existed a north-south road from the general location of present-day

8    Casa Blanca Road going south to meet the main military road coming up past

9    Picacho.

10   69.    As of 1885, maps showed the existence of roadways in the township in which Section

11   16 is located.

12   70.    As GRIC's expert concedes, in 1911, 1912, and 1913, there were roads that provided

13   physical access to Section 16.

14   71.    Roads existing in 1913 were flexible in their location because of water run-off and

15   flooding, among other reasons.

16   72.    In 1913, there existed an east-west road from the city of Maricopa to the city of

17   Sacaton.  There are indications that the road was graded.

18   73.    The 1913 east-west road provided a route between the communities of Maricopa and

19   Sacaton.

20   74.    In 1915, there was a north-south road beginning at Casa Blanca Road and proceeding

21   in a general southerly-southeast direction to the railroad tracks.  The road touched the

22   northeast corner of Section 16.

23   75.    At all relevant times, there have been roadways that touched, provided access to, or

24   physically crossed Section 16.

25   76.    In 1922, Pinal County declared public roads along all section lines in the "Valley

26   District."  The Valley District included Section 16.

27   77.    Post-1922 maps and aerials show the alignment of Smith-Enke Road and Murphy

28   Road on section lines.

78.   There are no recorded easements or rights-of-way on Murphy Road south of Casa Blanca Road.

79.   There are no recorded easements or rights-of-way on Smith-Enke Road.

80.   No one has ever requested an easement or right-of-way to Section 16.

81.   Other than the installation of the SCIP electricity poles and lines in 2002, there is no record of anyone requesting an easement or right-of-way to Section 16.

82.   The BIA maintains roads that are listed on the BIA road system, which roads are known as Indian Reservation Roads ("IRR").

83.   The BIA only needs a right-of-way for an IRR if the road was constructed, which means a surveyed and engineered road.

84.   The BIA did not construct Murphy Road south of Casa Blanca Road.

85.   To get a road listed on the BIA road system, an Indian tribe must file an application.

86.   The BIA receives federal funds to maintain IRRs and considers the roads to be public roads.

87.   Murphy Road is listed as an IRR and is designated as BIA Route 93.

88.   Murphy Road, north of Casa Blanca Road, is paved.

89.   Murphy Road, from Casa Blanca Road south to the Reservation's southern boundary, was listed in the past as part of BIA Route 93.

90.   BIA Route 93 is listed in GRIC's 1984 General Land Use Plan as being 4.8 miles long.

91.   In 2001, Vernon Palmer, BIA's Western Regional Roads Engineer, wrote: "BIA Route 93, locally known as Murphy Road, is a public roadway extending 1 mile north of Casa Blanca Road and 3 miles south of Casa Blanca Road.  This 4 mile roadway section has been constructed and is maintained with public funds."

92.   In 2004, GRIC erected "no trespassing signs" at the Reservation's southern boundary, adjacent to Murphy Road, and at the Reservation's western boundary, adjacent to Smith-Enke Road.

93.   Despite the presence of the "no trespassing" signs, public use of Smith-Enke Road

1   and Murphy Road continues.

2   94.   The Gila River Police Department has not attempted to block use of Smith-Enke Road
3         or Murphy Road near Section 16.

4   95.   In 2002, Michael Schugg spoke with Fred Ringlero, at the time the Director of Land
5         Use Planning and Zoning for GRIC, concerning Mr. Schugg's request for the San
6         Carlos Irrigation Project ("SCIP") to bring electric power to Section 16.

7   96.   Mr. Schugg worked with the Bureau of Indian Affairs ("BIA") and GRIC to obtain
8         a utility easement for the construction of an electric line to Section 16 in 2002, which
9         was granted.

10  97.   Mr. Ringlero told Mr. Schugg that there was no legal access to Section 16 and helped
11        Mr. Schugg get the utility easement because it was for a dairy, which was consistent
12        with the use of the surrounding land.

13  98.   There are electricity poles and lines adjacent to Smith-Enke Road, serviced by
14        Arizona Public Service Company ("APS"), that extend across the Encircling Strip and
15        provide electricity to Section 16.

16  99.   There is an underground gas line adjacent to Smith-Enke Road, serviced by Southwest
17        Gas Corporation, that extends across the Encircling Strip and provides gas services
18        to Section 16.

19  100.  There are electricity poles and lines adjacent to Murphy Road, installed by the San
20        Carlos Irrigation Project ("SCIP"), a division of the Bureau of Indian Affairs ("BIA"),
21        that extend across the Reservation and provide electricity to Section 16.

22  101.  At the Debtors' request, SCIP installed the electricity poles and lines in 2002.

23  102.  When the Debtors sought installation of the SCIP poles and lines, GRIC participated
24        in the process and did not object to the installation.

25  103.  There are telephone lines adjacent to Smith-Enke Road that extend across the
26        Encircling Strip and provide telephone service to Section 16.

27  **Zoning**

28  104.  Currently, approximately 12,000 GRIC members reside on the Reservation.

105.   In the past, GRIC primarily had an agricultural-based economy, but has since diversified.  The major economic engine in the diversification are the three casinos: the Wild Horse Pass Casino and Resort, Vee Quiva Casino and Lone Butte Casino.

106.   The casinos account for approximately 80% of GRIC's total income.

107.   From 2003 to 2006, casino revenue increased.

108.   From 2000 to 2006, casinos were the largest employers on the Reservation.

109.   In 2003, GRIC had a budget of approximately $100 million.  In 2006, the budget was about $110 million.

110.   The Reservation contains remnants of the Japanese Internment Camps from World War II nearby Section 16.  During World War II, approximately 13,000 Japanese individuals were interned at the camps.

111.   Section 16, while located within District 5 of the Reservation, was never a part of the Reservation.

112.   GRIC has developed several casinos, a resort hotel with two eighteen-hole golf courses, a race track, a Western-themed attraction (Rawhide), two operating industrial parks, and other commercial development on the northern part of the Reservation.

113.   Gila River Farms, Inc., an entity owned and operated by GRIC, leases and farms certain lands within Districts 3 and 5 of the Reservation, including the land to the south and west of Section 16.

114.   Gila River Farms currently leases 957 acres to the south and west of Section 16 from GRIC and the individual allottees.  The collection of these leases is referred to as the "960 Lease."

115.   Gila River Farms grows or crops about 12,000 acres per year.

116.   The 2004 Water Settlement Act, which provides GRIC with more than 600,000 acre-feet of new water, will allow for additional acres to be farmed.

117.   While the Gila River Farms manager is concerned that the residential development of Section 16 would hinder farming on the 960 Lease because of groundwater issues, no independent research has been done to support such a concern.

118.   While the Gila River Farms manager is concerned that the residential development of Section 16 would hinder farming on the 960 Lease by increasing traffic and limiting the spraying of insecticides, other residential developments in or around the Reservation are located near farming operations and such farming operations, other than issues of garbage, broken canals and trespassers, have not been adversely impacted.

119.   From 2003 to 2006, no farm had to shut down because of residential developments on the Reservation's border.

120.   The city of Sacaton is a good example of farms and residential housing right next to or adjacent to one another.

121.   In 2004, GRIC became aware that a request was being made to amend the Pinal County land use designation for Section 16 from "Rural" (allowing 1.25 houses per acre) to "Transitional" (allowing a higher-density housing development).

122.   Developers interested in purchasing Section 16 intended to develop it.

123.   With a density of 3.5 homes per acre, a developer could build approximately 2,250 homes on Section 16.

124.   For a developer to get a recorded plat for a subdivision, major cities and counties require two ingress and egress areas for police and fire.

125.   On July 26, 2004, GRIC submitted an objection to Pinal County regarding the application to amend the County's land-use designation for Section 16.

126.   Pinal County ultimately rejected the application to amend the land-use designation for Section 16.

127.   The Pinal County Sheriff's Department provides law enforcement services to the City of Maricopa.

128.   The owners of Section 16 have over 2,000 acre-feet of water rights.

129.   The nearby City of Maricopa, Arizona, is undergoing rapid development, and real estate developers are seeking land in the vicinity of the city for the purpose of residential and commercial development.

130. The City of Maricopa is separated from Section 16 by approximately one-half mile of Indian lands the majority of which consist of Indian allotments.

131. In 1984, GRIC created and adopted a General Land Use Plan (the "Plan") for the entire Reservation.

132. The general goal of the Plan is to accommodate GRIC's cultural values by creating more agricultural areas and protecting open spaces.

133. The Plan attempts to limit industrial and commercial development to the "north central planning area."

134. The Plan is not a detailed plan for any land use or particular parcel of land.

135. After adoption of the Plan, a Reservation-wide zoning ordinance was to be created. However, no such zoning ordinance was ever created.

136. Only one area of the Reservation, near the Wild Horse Pass Casino and Resort, is zoned.

137. In contrast to the Plan's projections, there has been significant residential and commercial development north, south and east of the Reservation.

138. Some of the land on which the Wild Horse Pass Casino and Resort is located was under agricultural use prior to construction.

139. There are residential communities, both on and off the Reservation, that are located near farms.

140. While GRIC is concerned that residential development on Section 16 would have an adverse impact on agricultural operations on land surrounding Section 16, no actual studies were performed to explain such impact.

141. While GRIC is concerned about water supplies and waste water disposal should residential development on Section 16 occur, there is no indication why such residential water use and disposal is unacceptable or would adversely impact GRIC's water resources.

142. While GRIC is concerned about the lack of a storm water plan and about ground contaminants (from the dairy operation) being forced into the groundwater, no actual

1    studies were performed to support such concerns.

2    143.   Gila River Emergency Medical Services ("GREMS") employs 40 full-time and 20

3           part-time employees.

4    144.   During a typical 24-hour shift, GREMS has six emergency medical technicians, six

5           paramedics and one supervisor on duty, and has six ambulances in use.

6    145.   GREMS cannot differentiate between an emergency call from a GRIC member and

7           an emergency call from a non-member.

8    146.   GREMS has one ambulance stationed in District 5, the district in which Section 16

9           is located.

10   147.   There are 82 sworn officers employed by the Gila River Police Department

11          ("GRPD").

12   148.   The GRPD employs rangers who protect the exterior boundaries of the Reservation.

13   149.   During a typical shift, there are four patrol officers, one supervisor and one to two

14          rangers on duty.

15   150.   Seven officers are assigned to school campuses on the Reservation as school resource

16          officers.

17   151.   The GRPD's jurisdiction includes the Reservation surrounding Section 16 but does

18          not include Section 16.

19   152.   There has been an increase in the frequency of non-resident trespassers on the

20          Reservation, which is attributed to the residential development around the

21          Reservation.

22   153.   The GRPD has seen an increase in traffic on Reservation roads, and increased

23          complaints about drivers and traffic congestion, due to residential development south

24          of Section 16 and the Reservation.

25   154.   According to GRIC's estimates, if residential development of Section 16 were to

26          occur, an estimated peak hour could have 850 vehicles using the roads in the vicinity

27          of Section 16.

28   155.   The GRPD does not have the resources to handle the increased traffic.

156.   An increase in traffic in the vicinity of Section 16 would require improvements to Smith-Enke Road, Murphy Road and Casa Blanca Road.

157.   The majority of the dirt section line roads within the Reservation, including Smith-Enke Road and Murphy Road, are in use.

158.   When the GRPD gets an emergency call, they must determine if the emergency is on the Reservation before responding; however, if it is a life-threatening emergency, the GRPD will respond regardless of the location.

159.   Smith-Enke Road and Murphy Road are periodically patrolled; they are not regularly patrolled because the GRPD lacks the personnel.

160.   Other law enforcement agencies and emergency services (other than GRIC) would be allowed to access Section 16 to render services.

161.   The development of the Wild Horse Pass Casino and Resort has led to increased calls of criminal conduct.

162.   The presence of the Vee Quiva Casino and Lone Butte Casino has increased GRPD service calls in those areas.

163.   The casinos on the Reservation employ private security; no GRPD officers are stationed at the casinos as part of a regular shift.

164.   Casinos and other businesses bring thousands of non-GRIC members onto the Reservation every day.

165.   Employees of GRIC's Cultural Resource Management Program ("CRMP") have surveyed 42% of the Reservation resulting in the discovery of approximately 1,150 cultural resource sites.

166.   There are numerous cultural resource sites off the Reservation.

167.   The CRMP has never surveyed Section 16.

168.   There are extensive cultural resource sites within a five mile radius of Section 16.

169.   Development around the Reservation has negatively impacted cultural resource sites.

170.   There has been a negative impact on cultural resource sites around the Wild Horse Pass Casino and Resort and Vee Quiva Casino.

171.   In 2002, a survey was done before the installation of the SCIP electricity poles and lines.  The survey began along the eastern boundary of Section 16 and proceeded north. No significant cultural resource sites were found in the area of potential effect.

**II.    Conclusions of Law**

1.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1334 and 1362.

**Indispensable Party**

2.     The Court may raise *sua sponte* the failure to join a person under Rule 19 of the Federal Rules of Civil Procedure at any stage of the litigation. *UOP v. United States*, 99 F.3d 344, 347 (9th Cir. 1996); *Faunce v. Bird*, 210 F.R.D. 725, 727 (D. Or. 2002).

3.     A party is "required" if in its absence complete relief cannot be accorded among existing parties.  Fed. R. Civ. P. 19(a)(1)(A).

4.     Alternatively, a party is "required" if it claims an interest in the subject of the action such that a decision in its absence will impair or impede its ability to protect that interest or expose an existing party to a risk of multiple or inconsistent obligations. Fed. R Civ. P. 19(a)(1)(B)(i) and (ii).

5.     If a party is required, the Court must order that the party be joined.  Fed. R. Civ. P. 19(a)(2).  However, if the party cannot be joined, the Court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

6.     The factors the Court considers include (1) the extent to which a judgment rendered in the party's absence might prejudice that party or existing parties; (2) the extent to which any such prejudice could be lessened or avoided by protective provisions or shaping relief; (3) the adequacy of a judgment rendered in the person's absence; and (4) whether the plaintiff would have an adequate remedy of the action were dismissed for nonjoinder.  Fed. R. Civ. P. 19(b)(1)-(4).

7.     Following the reasoning set forth in the Court's March 9, 2006 Order, the Court concludes that the United States, with respect to GRIC's counterclaim disputing legal access across its tribal land, is a required party, but is not an indispensable party

requiring dismissal of this action in its absence. *See Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251, 1254 (9th Cir. 1983) ("[I]n a suit by an Indian tribe to protect its interest in tribal lands, regardless of whether the United States is a necessary party under Rule 19(a), it is *not* an indispensable party in whose absence litigation cannot proceed under Rule 19(b).").

8.    The Court also concludes that the United States, in its capacity as trustee of the land allotted to individual Indians and with respect to the Trustee's claim that it has legal access across that allotted land, is a required party under Rule 19(a). *See Carlson v. Tulalip Tribes of Washington*, 510 F.2d 1337, 1339 (9th Cir. 1975) ("[T]he United States is a necessary party to any action in which the relief sought might interfere with its obligation to protect Indian lands against alienation.").

9.    The Court further concludes that the United States cannot be joined because it has not waived sovereign immunity in actions to establish an easement across trust or restricted Indian lands. *See State of Alaska v. Babbitt*, 38 F.3d 1068, 1074 (9th Cir. 1994) (concluding that "both the [Quiet Title Act's] general waiver of sovereign immunity, as well as its exception for Indian lands, apply to cases involving claims for less than fee simple title interests to disputed property.").

10.   Nonetheless, considering the factors listed in Rule 19(b)(1)-(4), the Court concludes that "equity and good conscience" require that this action proceed among the existing parties such that the United States, as trustee of the land allotted to the individual Indians, is not an indispensable party requiring dismissal of this action in its absence.[1]

11.   First, a judgment rendered in the United State's absence will not prejudice the United

---

[1]The Court recognizes that, in the cases GRIC cites, the Ninth Circuit concluded that the United States, in actions involving title to Indian land, is a required party under Rule 19 and, because joinder is not feasible, an indispensable party requiring dismissal of the action. *See Imperial Granite Co. v. Pala Band of Indians*, 940 F.2d 1269, 1272 n.4 (9th Cir. 1991); *Carlson v. Tulalip Tribes of Washington*, 510 F.2d 1337, 1339 (9th Cir. 1975). However, in neither case did the Ninth Circuit discuss the "equity and good conscience" prong of Rule 19 and its impact on the analysis.

1    States because the United States will not be bound by the Court's judgment.  *See*

2    *Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456, 458 (10th Cir. 1951) (finding

3    that the United States, "[b]y reason of its guardianship and its governmental interest"

4    in Indian land, would not in its absence be bound by a judgment in an action to

5    establish title to claimed Indian land).

6    12.   Second, while a judgment rendered in the United State's absence may be prejudicial

7          to and inadequate for the Trustee, insofar as any legal access will be clouded by the

8          risk that the United States will hereafter contest such access, the Trustee has

9          acknowledged that potential and urges the Court to proceed nonetheless.  *See* Doc. #

10         277, p. 8 ("While it may be that the United States will not be bound by a decision of

11         this Court in this matter, it is nonetheless important for this Court to determine the

12         rights of the Trustee with regard to GRIC.").

13   13.   Finally, the Court notes that if this action were dismissed for nonjoinder of the United

14         States, then the Trustee would have no available forum within which to determine the

15         legal access issue with regard to GRIC.

16   14.   The Court also concludes that GRIC has failed to show that the individual Indian

17         allottees are required parties under Rule 19.[2]  GRIC has offered only conclusory

18         statements concerning the individual allottees' interest in this action.  GRIC has failed

19         to present any evidence tending to show that the individual allottees' interest in the

20         allotted land, in light of the United States holding the land in trust for their benefit,

21         makes them required parties under Rule 19.  *See Imperial v. Castruita*, 418 F. Supp.

22         2d 1174, 1178 (C.D. Cal. 2006) (finding conclusory statements, without evidence

23         showing absent parties are indispensable, to be insufficient to support dismissal under

---

[2]While GRIC has not filed a motion seeking dismissal of this action for failure to join a person under Rule 19, GRIC has filed briefs in which it argues that dismissal under Rule 19 is appropriate.  Accordingly, the Court concludes that GRIC bears the burden of showing that the individual Indian allottees are required parties under Rule 19.  *See Clinton v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir. 1999) (citations omitted).

1    Rule 19).[3]

2    **Access to Section 16**

3    15.    The Trustee bears the burden of proving that it has legal access to Section 16.

4    16.    Murphy Road, north of Casa Blanca Road, is an Indian Reservation Road ("IRR")

5           identified as BIA Route 93.

6    17.    However, the Trustee claims that all of Murphy Road, including the portion of

7           Murphy Road from Casa Blanca Road south to the Reservation's southern boundary

8           (the "southern portion"), is an IRR that provides legal access to Section 16.   In

9           response, GRIC counterclaimed seeking declaratory relief that Murphy Road does not

10          provide legal access to Section 16.  In support of that counterclaim, GRIC argues that

11          the southern portion of Murphy Road is not part of the IRR because it lacks a right-of-

12          way and, as a result, it was erroneously listed in the past as part of BIA Route 93.

13   18.    The owner of property abutting a public road has the right to use the road and to

14          access the road from his property.  *See State of Arizona v. Thelberg*, 350 P.2d 988,

15          991 (Ariz. 1960) (citations omitted) (stating that the "owner of property abutting on

16          a public highway possesses, as a matter of law, not only the right to the use of the

17          highway . . ., but also a private right or easement for the purpose of ingress and egress

18          to and from his property."

19   19.    An IRR is "a public road that is located within or provides access to an Indian

20          reservation." 23 U.S.C. § 101(a)(12).

21   20.    A public road is "any road or street under the jurisdiction of and maintained by a

22          public authority and open to public travel."  23 U.S.C. § 101(a)(27).

23   21.    The term "'public authority' means a Federal, State, county, town, or township, Indian

24

25   _____

26       [3]Tempering the potential prejudicial impact on the individual Indian allottees is the
     principle that, "[a]s a general rule, one is not bound by a judgment *in personam* in a litigation

27   in which he is not designated as a party or to which he has not been made a party by service
     of process."  *Sandpiper Village Condominium Ass'n., Inc. v. Louisiana-Pacific Corp.*, 428

28   F.3d 831, 848-49 (9th Cir. 2005) (citations and internal quotations omitted).

tribe, municipal or other local government or instrumentality with authority to finance, build, operate, or maintain toll or toll-free facilities." 23 U.S.C. § 101(a)(23).

22. Murphy Road is located within the Gila River Indian Reservation.

23. Murphy Road has been under the jurisdiction of and maintained by various public authorities, including GRIC. In the mid-1990's, GRIC contracted with the BIA and took over maintenance of the BIA roads on the Reservation.

24. For decades, Murphy Road has been open to public travel.

25. Approximately one year ago, GRIC stopped maintaining the southern portion of Murphy Road because it learned that no right-of-way exists on that part.

26. The doctrine of laches applies against Indian tribes. *See City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 221 (2005). The doctrine of laches also applies to cases involving possessory Indian land claims. *See Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266, 273-78 (2nd Cir. 2005).

27. "To invoke laches as a defense there must be (1) a lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1208 (9th Cir. 1970).

28. The Court finds that the past inclusion of the southern portion of Murphy Road as part of BIA Route 93, GRIC's maintenance of Murphy Road, and GRIC's lack of objection and acquiescence to the use of Murphy Road by the public, both before and after the sale of Section 16 to the Debtors, induced the Debtors to rely thereon and use the southern portion of Murphy Road to access Section 16. The Debtors and the Trustee would be prejudiced if GRIC were now allowed to prevent access to Section 16 by advancing a claim that the southern portion of Murphy Road is no longer an IRR and no longer maintained. Accordingly, the Court concludes laches prevents GRIC from obtaining declaratory relief that there is no legal access to Section 16 via the southern portion of Murphy Road by virtue of the argument that the southern portion was, in the past, erroneously listed as part of BIA Route 93 and that maintenance thereon has

1    been terminated.

2    29.   As a result, the Court concludes that the Trustee has shown that Murphy Road, from

3          Casa Blanca Road south to the Reservation's southern boundary, is an Indian

4          Reservation Road, as defined above, that is "open and available for public use."  25

5          C.F.R. § 170.120.

6    30.   The Trustee next claims that both Smith-Enke Road and Murphy Road are public

7          roads pursuant to Revised Statute § 2477.

8    31.   R.S. § 2477, 43 U.S.C. § 932 (1976) (repealed), provided that "the right of way for

9          the construction of highways over public lands, not reserved for public uses, is hereby

10         granted."

11   32.   R.S. § 2477 establishes rights-of-way for highways constructed before its passage in

12         1866, *see Central Pacific Railway Co. v. Alameda County*, 284 U.S. 463, 473 (1932),

13         and also "operates prospectively to grant rights of way for highways constructed after

14         its enactment," *United States v. Gates of the Mountains Lakeshore Homes, Inc.*, 732

15         F.2d 1411, 1413, n.3 (9th Cir. 1984).

16   33.   The repeal of R.S. § 2477 did not apply retroactively; thus, R.S. § 2477 was a

17         congressional offer to construct roads over public lands that remained open until

18         1976.  *See* 43 U.S.C. § 1769(a).  Any rights-of-way that had existed prior to the date

19         of the repeal were preserved.  *Adams v. United States*, 3 F.3d 1254, 1258 (9th Cir.

20         1993).

21   34.   To determine whether an R.S. § 2477 right-of-way exists, the Court looks to the law

22         of the state in which the right-of-way purportedly exists in order to determine whether

23         the federal grant was accepted.  *See Standage Ventures, Inc. v. Arizona*, 499 F.2d 248,

24         250 (9th Cir. 1974).

25   35.   Arizona cases analyzing R.S. § 2477 require "strict compliance with the provisions

26         of Arizona law" for an R.S. § 2477 right-of-way to exist.  *State v. Crawford*, 441 P.2d

27         586, 590 (Ariz. Ct. App. 1968).

28   36.   The *Crawford* court explained:

Cases decided under 43 U.S.C.A. § 932 hold that it constitutes an offer on the part of the federal government to dedicate unreserved lands for highway purposes, which offer must be accepted by the public in order to become effective.  Whether the offer to dedicate which is made under the federal act is accepted by the establishment of a public highway is an issue to be determined under the law of the state where the highway is located.  The federal statute does not of itself operate to grant right-of-ways and establish highways contrary to the local laws.  The latter case makes it clear that, in order for there to be a public highway, the right-of-way for which is granted by the federal act, the highway must be established in strict compliance with the provisions of the Arizona law.  And, just as the local state law is determinative of the issue of whether or not a public highway exists at all, it is also determinative of the issue of the width and extent of the public right-of-way.

*Id.* (citations omitted).

37.   The right-of-way must be established prior to the land losing its public character.  *See id.* (stating that, for the establishment of a right-of-way for public highway purposes, the "critical question" is "whether the State did so establish its claimed right-of-way prior to the time when plaintiff's predecessors took fee title to all the land in question."); *see also Adams*, 3 F.3d at 1258 (stating, for the establishment of an easement, that the plaintiffs "must show that the road in question was built before the surrounding land lost its public character.").

38.   "It has been long established that Indian reservation land is not public land."  *United States v. Schwarz*, 460 F.2d 1365, 1372 (7th Cir. 1972) (citations omitted).

39.   The Trustee has made no showing that the State of Arizona established any rights-of-way for public highway purposes in the vicinity of Section 16 prior to 1883 and/or 1913, when the land surrounding Section 16 lost its public character by virtue of the creation and additions to the Reservation.

40.   While *Adams*, 3 F.3d 1254, appears to support the Trustee's argument that Smith-Enke Road and Murphy Road only needed to have existed prior to the land surrounding Section 16 losing its public character, the Court notes that *Adams* involved an alleged easement.  In contrast, the Trustee herein is seeking to have Smith-Enke Road and Murphy Road declared public roads pursuant to R.S. § 2477, which the Court finds, pursuant to *Crawford*, 441 P.2d 586, requires the State of Arizona to have established

1    the rights-of-way prior to the land losing its public character.

2    41.   The Court concludes that Smith-Enke Road and Murphy Road are not public roads

3          under R.S. § 2477.

4    42.   The Trustee next claims that there is an implied easement providing access to Section

5          16.  The Trustee claims that the implied easement arises from the intent of the federal

6          government to create an easement for school lands transferred to the states and/or by

7          necessity.

8    43.   Legislation dealing with school trust lands is liberally construed.  *Utah v. Andrus*, 486

9          F. Supp. 995, 1001-02 (D. Utah 1979)

10   44.   In granting school trust lands to the states, the federal government intended for the

11         school sections, through the sale thereof, to provide a revenue base to support public

12         education.  *Id.* at 1002.

13   45.   *Andrus* further provides:

14                Given the rule of liberal construction and the Congressional
                 intent of enabling the state to use the school lands as a means of
15               generating revenue, the court must conclude that Congress
                 intended that Utah (or its lessees) have access to the school
16               lands.  Unless a right of access is inferred, the very purpose of
                 the school trust lands would fail.  Without access the state could
17               not develop the trust lands in any fashion and they would
                 become economically worthless.  This Congress did not intend.

18         *Id.*

19   46.   Based on *Andrus*, the Court concludes that, in 1877, when Section 16 was conveyed

20         as school land to the then Territory of Arizona,[4] an implied easement to the land also

21         was conveyed.

22   47.   The Court also concludes that the implied easement to Section 16 has been conveyed

23
24   _____

25        [4]The Court concludes that Section 16 was conveyed to the Territory of Arizona in
     1877, when the survey of Section 16 was filed.  While GRIC cites *United States v. Southern
26   Pacific Transp. Co.*, 601 F.2d 1059, 1066 (9th Cir. 1979), to support its argument that the re-
     survey of parcels surrounding Section 16, filed in 1921, supersedes the original survey filed
27   in 1877, the Court is not persuaded that such an effect results in the reversal of the prior
     conveyance of Section 16 to Arizona.
28

1
2
3
4

to all subsequent owners of Section 16. *See* C.J.S. Easements § 111 ("Where an easement is annexed as an appurtenance to land by an express or implied grant or reservation, or by prescription, it passes with a transfer of the land although not specifically mentioned in the instrument of transfer.").

5
6
7
8
9
10

48.   Because access to Section 16 cannot be "so narrowly restrictive as to render the lands incapable of their full economic development," *Andrus*, 486 F. Supp. at 1009, the Court concludes that the Trustee has an implied easement over Smith-Enke Road. Further, in the alternative to the conclusion that the southern portion of Murphy Road is an Indian Reservation Road, the Court also concludes that the Trustee has an implied easement over Murphy Road.

11
12
13
14
15
16
17

49.   An easement by necessity is created when: (1) there was at one time common ownership of the parcels in question, (2) the common ownership was severed by a conveyance of either the dominant or servient parcel, and (3) an easement is reasonably necessary for the owner of the dominant parcel at the time of the severance and at the time of exercise of the easement. *Montana Wilderness Ass'n v. United States Forest Service*, 496 F. Supp. 880, 885 (D. Mont. 1980); *Barnes v. Babbitt*, 329 F. Supp. 2d 1141, 1148 (D. Ariz. 2004).

18
19

50.   An easement by necessity is extinguished once the necessity is no longer present. *Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1266 (9th Cir. 2006).

20
21
22

51.   "With the existence of a statutory right of access, no necessity exists for a common law easement." *Fitzgerald v. United States*, 932 F. Supp. 1195, 1203 n.3 (D. Ariz. 1996).

23
24

52.   The Trustee has a legal mechanism to obtain a right of access to Section 16. *See* 25 C.F.R. § 169.1, *et seq.*

25
26
27

53.   While 25 C.F.R. § 169.1, *et seq.*, does not provide an absolute right of access, since consent of the tribe and Secretary of Interior is necessary, it nonetheless does provide the Trustee a method by which to obtain a right of access.

28

54.   The Court concludes that until the Trustee applies for a right of access pursuant to 25

1  C.F.R. § 169.1, *et seq*., and such right of access is denied, no necessity exists for a

2  common law easement.  The Court also concludes that no necessity exists for a

3  common law easement because the Court already has concluded that Murphy Road,

4  from Casa Blanca Road south to the Reservation's southern boundary, is an Indian

5  Reservation Road, and that an implied easement exists over Smith-Enke Road and,

6  in the alternative, Murphy Road.

7  55.  While the Trustee is seeking to have the Court rule on the scope of the easements, for

8  current and future owners, the Court concludes that there is no actual case or

9  controversy such that any ruling would be an improper advisory opinion.  *See*

10  *Rhoades v. Avon Products, Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007) (stating that

11  courts may adjudicate only actual cases or controversies; otherwise, a judgment would

12  be an unconstitutional advisory opinion).  There has been no showing that the

13  easements, as configured, are insufficient to support the current use of Section 16.

14  Any ruling on the scope of the easements, based on possible future use or

15  development of Section 16, would be speculative at best and would constitute an

16  advisory opinion.

17  **Zoning**

18  56.  GRIC seeks a ruling from the Court that it has the right to regulate the conduct of non-

19  members on Section 16 by controlling the zoning of Section 16.

20  57.  GRIC may "'retain inherent power to exercise civil authority over the conduct of non-

21  Indians on fee lands within its reservation when that conduct threatens or has some

22  direct effect on the political integrity, the economic security, or the health or welfare

23  of the tribe.'" *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*,

24  492 U.S. 408, 428 (1989), *quoting Montana v. United States*, 450 U.S. 544, 566

25  (1981).

26  58.  "The impact *must be demonstrably serious and must imperil* the political integrity, the

27  economic security, or the health and welfare of the tribe." *Id.* at 431 (italics added).

28  59.  At trial, it became clear that there are no current plans to sell Section 16 to a

1    developer and no current plans to construct residential homes on Section 16.

2    60.   To the extent GRIC seeks, if at all, the right to control the zoning over Section 16 as

3          it presently is being used, the Court concludes that GRIC has failed to show that the

4          present use has a demonstrably serious impact and imperils the political integrity,

5          economic security, or health and welfare of the tribe.

6    61.   To the extent GRIC seeks the right to control the zoning over Section 16 based on the

7          potential sale of Section 16 to a developer and the developer's potential plans for

8          Section 16, the Court concludes, like the Trustee's claim seeking a ruling on the scope

9          of the easements, there is no actual case or controversy and any such ruling would

10         constitute an improper advisory opinion.

11   *62.*  In the alternative, if there is an actual case or controversy, then the Court concludes

12         that speculation concerning the potential impacts of a potential sale and development

13         of Section 16 is insufficient to show a demonstrably serious impact that imperils

14         GRIC's political integrity, economic security, or health and welfare. *See Yellowstone*

15         *County v. Pease*, 96 F.3d 1169, 1177 (9th Cir. 1996) (concluding that speculation

16         concerning possible results is insufficient to show the necessary imperilment).

17   63.   In the further alternative, if potential impacts can be found sufficient, then the Court

18         concludes that the evidence GRIC presented at trial fails to show that the development

19         of Section 16 will have a demonstrably serious impact and will imperil GRIC's

20         political integrity, economic security, or health and welfare.  Section 16 is located

21         near the border of the Reservation and is close to the City of Maricopa, which is

22         undergoing rapid residential and commercial development significant.  While the

23         development of Section 16 will bring additional people onto the Reservation, GRIC

24         has failed to show that the impact on its police department, emergency medical

25         responders, water resources, farming operations, and cultural resources will be

26         demonstrably serious and will imperil GRIC's political integrity, economic security,

27         or health and welfare.

28

**Trespass**

64.     GRIC claims that the Debtors and their invitees have trespassed on tribal and allotted lands by accessing Section 16 over roadways where no legal access existed.

65.     Because the Court has concluded that legal access to Section 16 does exist, the Court also concludes that the Debtors and their invitees have not trespassed on GRIC's tribal and allotted lands.[5]

66.     Further, the Court notes that GRIC, during the trial, failed to put on any evidence of damages related to the alleged trespass.   While GRIC states in its proposed conclusions of law that it is entitled to damages, the amount of which shall be determined in a subsequent hearing, no such subsequent hearing was contemplated. Accordingly, even if GRIC had proven that the Debtors and their invitees trespassed on GRIC's tribal and allotted lands, GRIC would not be entitled to any damages.

**III.     Judgment**

Based on the foregoing,

**IT IS ORDERED** that Plaintiff is entitled to legal access to Section 16, that Defendant is not entitled to exercise zoning authority over Section 16, and that no trespass on the Gila River Indian Reservation has occurred, all in accordance with the foregoing findings and conclusions, and the Clerk of Court shall enter judgment accordingly in favor of Plaintiff and against Defendant;

**IT IS FURTHER ORDERED** that the Motion to Quash Subpoena to William Rhodes (Doc. # 231) is DENIED as moot; and

---

[5]Because of the limitations of this judgment as discussed in the indispensable party section, and questions the Court has concerning GRIC's authority to prosecute a claim of trespassing on land allotted to individual Indians, the Court limits its conclusion on trespass to GRIC and its tribal and allotted lands.

1

2          **IT IS FURTHER ORDERED** that the Motion for Judicial Notice of Removal of a

3   Portion of Murphy Road from the BIA Road System (Doc. # 259) is DENIED.

4          DATED this 12th day of February, 2008.

5

6

7   _____
                      James A. Teilborg
8                United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28