1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8

9   In re:                                  No. CV-05-02045-PHX-JAT

10  Michael Keith Schugg, dba Schuburg       **ORDER**
    Holsteins,
11
                      Debtor,
12
    In re:
13
    Debra Schugg,
14
                      Debtor,
15
    G. Grant Lyon in his capacity as Chapter 11
16  Trustee of the bankruptcy estate of Michael
    Keith Schugg and Debra Schugg; Wells
17  Fargo Bank,

18                    Plaintiffs,

19  v.

20  Gila River Indian Community,

21                    Defendant.

22
            Pending before the Court are the Trustee's Motion for Summary Judgment
23
    Regarding Scope of Implied Easement (Doc. 392) and Gila River Indian Community's
24
    Motion to Dismiss or, in the Alternative, for Summary Judgment and Memorandum in
25
    Support (Doc. 396). Also pending is the parties' stipulation to permit Gila River Indian
26
    Community to file select documents and portions of its briefing under seal (Doc. 394).
27
    **I.      BACKGROUND**
28
            This case was filed by G. Grant Lyon acting solely in his capacity as Chapter 11

Trustee of the bankruptcy estate of Michael Keith Schugg and Debra Schugg (the "Trustee"). The Defendant/Counter-Plaintiff Gila River Indian Community ("GRIC") is a federally-recognized Indian Community organized under Section 16 of the Indian Reorganization Act, 25 U.S.C. § 461, *et seq*. GRIC is based on the Gila River Indian Reservation (the "Reservation"), which consists of approximately 372,000 acres in south-central Arizona, and includes members of the federally-recognized Akmil O'odham ("Pima") and Peeposh ("Maricopa") Tribes.

Between 2001 and 2003, S&T Dairy (the "Dairy") was constructed on land known as Section 16 of Township 4 South, Range 4 East in Pinal County, Arizona, comprising approximately 657 acres ("Section 16"). In or about September 2003, Michael Schugg and Debra Schugg (the "Schuggs") acquired title to Section 16.  Section 16 is located wholly within the Reservation and is physically accessible by Smith-Enke Road and Murphy Road. In 2004, the Schuggs made a request to amend the Pinal County land use designation from "Rural" to "Transitional" (allowing a higher-density housing development). The GRIC objected to the amendment to the land use designation and Pinal County ultimately rejected the application.

In 2004, the Schuggs declared bankruptcy and listed Section 16 as their largest asset. During the bankruptcy proceedings, the GRIC filed a proof of claim asserting that it had an exclusive right to use and occupy Section 16, authority to impose zoning and water use restrictions on Section 16, and a right to injunctive and other relief for trespass on reservation land and lands to which it held aboriginal title. The Trustee then initiated an adversary proceeding seeking a declaratory judgment that the Schuggs' estate had legal title and access to Section 16. In 2005, Plaintiffs and Defendants stipulated that the reference should be withdrawn to this Court.  (Docs. 29, 30).

In 2007, this Court presided over a bench trial, where the issues to be resolved by the Court were generally as follows: (1) whether there was an easement or right-of-way via Smith-Enke Road or Murphy Road for access and utilities to Section 16; (2) whether Murphy Road was an Indian Reservation Road that must remain open for public use; (3)

whether Smith-Enke Road and/or Murphy Road were public rights-of-way under Revised Statute 2477 that must remain open for public use; (4) whether the easement and/or right-of-way access (if any) to Section 16 included the right to improve the easements or install additional utilities thereon; (5) whether GRIC had the power to regulate zoning on Section 16; and (6) whether the Trustee, the Debtors, representatives of the S & T Dairy and/or their respective invitees, employees, assignees, agents, or representatives trespassed on tribal or allotted lands within the Gila River Indian Community's reservation.

At the conclusion of the trial, the Court determined that Plaintiffs were entitled to legal access to Section 16 due to an implied easement over Smith-Enke Road and a right of access over Murphy Road, either because of an implied easement or because the relevant portion of the road was Indian Reservation Road that must remain open for public use, that Defendant is not entitled to exercise zoning authority over Section 16, and that no trespass occurred. The Court also determined that the GRIC's assertion of authority to control the zoning of Section 16 was not ripe for adjudication.

The GRIC then appealed to the Ninth Circuit Court of Appeals ("Court of Appeals"). The GRIC appealed the Court's judgment that the United States was not an indispensable party to the action, the Trustee's rights of access to Section 16, and the rejection of the Community's assertions of aboriginal title and zoning authority over Section 16. The Trustee cross-appealed the District Court's finding that Smith-Enke Road and Murphy Road were not public roads under Revised Statute 2477. The Court of Appeals affirmed in part, but remanded for further consideration of whether Murphy Road was a public Road in light of ongoing proceedings before the Bureau of Indian Affairs regarding the issue of whether Murphy Road was an Indian Reservation Road open to the public.

After remand, the Parties filed a Joint Status Report (Doc. 314) informing the Court that the Trustee had withdrawn his appeal to the Bureau of Indian Affairs regarding the status of Murphy Road as a public road. The Parties agreed that, in light of this

1   dismissal, the question of whether Murphy Road was an Indian Reservation Road open to
2   the public was no longer subject to dispute in this case. In the Joint Status Report, the
3   Parties represented, "the parties agree that there are no longer any issues to be decided by
4   this Court on remand." (Doc. 314 at 2).

5       The Court then directed the Parties to jointly submit a proposed form of judgment
6   that "will close this case." (Doc. 315). When the Parties represented to the Court that they
7   were unable to agree on a proposed form of judgment, the Court ordered that each party
8   should separately file a proposed form of judgment or "motions as to why judgment
9   should not be entered at this time." (Doc. 319). Thereafter, the GRIC filed its Motion for
10  Entry of Final Judgment with a proposed form of judgment (Doc. 321) and the Trustee
11  filed a Motion to Set Rule 16 Hearing and Postpone Entry of Judgment (Doc. 320).

12      In the Motion to Set Rule 16 Hearing, the Trustee argued that entry of final
13  judgment was no longer appropriate in this case because the issue regarding the scope of
14  the easements, which this Court and the Court of Appeals previously ruled was not ripe
15  for adjudication, had recently become ripe for adjudication. (Doc. 320). The Court
16  determined that the issue regarding the scope of the easements was now ripe because the
17  Trustee intended to improve the easements pursuant to a specific development plan and
18  the GRIC had denied the Trustee permission to make those improvements. (Doc. 332).
19  Accordingly, the Court postponed the entry of judgment and set a Rule 16 hearing on the
20  issue of easement scope. The parties have now fully briefed the issue for the Court's
21  determination.

22  **II.    STIPULATION TO SEAL**

23      Before reaching the merits, the Court first addresses the GRIC's stipulation to file
24  certain documents under seal. *See* (Doc. 394). In the course of this lawsuit, the Schuggs
25  disclosed documents to the GRIC that contained the Schuggs' personal financial
26  relationships, namely an agreement between MARAZ-2006, LLC and Michael K.
27  Schugg. The parties have stipulated to seal the terms of this agreement and all derivative
28  documents in support of the GRIC's dispositive motion referencing those terms,

including the motion itself. (Doc. 394 at 1).

"[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). "Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). A party "seeking to seal a judicial record" bears the burden of articulating compelling reasons supported by specific factual findings in favor of sealing that "outweigh the general history of access and . . . public policies favoring disclosure." *Id.* at 1178-79. "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179. "The mere fact that the production of records may lead to a litigant's embarrassment . . . or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* This compelling reasons standard is properly applied to dispositive motions "and related attachments" because "the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" *Id.* (citation omitted).

Here, the parties have not demonstrated compelling reasons for sealing the terms of the agreement between MARAZ-2006, LLC and Michael K. Schugg. Although one does not ordinarily publicize the details of one's own personal financial transactions, "mere embarrassment" is insufficient to compel the Court to seal such records. *See id.* Neither party offers specific factual findings in favor of sealing; the parties' sole basis for sealing is that the agreement is a personal financial relationship and that the Trustee's counsel has designated evidence relating to that agreement as "confidential." Although the parties have stipulated to filing under seal, the Court is not bound by a stipulation of law "regardless of what the parties say the law might be." *U.S. Aluminum Corp./Texas v.*

1   *Alumax, Inc.*, 831 F.2d 878, 880 (9th Cir. 1987).

2      Accordingly, the Court finds the parties have not demonstrated compelling reasons

3   for filing under seal sufficient to overcome the strong presumption in favor of public

4   access to judicial records. The Court will deny the stipulation to file under seal.

5   **III.   RIPENESS**

6      The GRIC moves to dismiss the Trustee's complaint pursuant to Federal Rule of

7   Civil Procedure ("Rule") 12(b)(1) for lack of subject-matter jurisdiction. (Doc. 396). The

8   GRIC argues that despite the Court's prior Order determining that the scope of the

9   implied easement was ripe for adjudication, it remains unripe and therefore the Court

10  lacks subject-matter jurisdiction over this issue. (*Id.* at 3-4).

11     In its previous Order on ripeness, the Court determined that the issue of the scope

12  of the implied easement had become ripe because the Trustee had since created a plan for

13  developing Section 16 that required improving the existing easements. (Doc. 332 at 13-

14  14). The GRIC refused (and refuses) to permit the Trustee to pave the implied easements

15  and use them to support the traffic necessary to use the developed Section 16. (*Id.* at 10).

16  Accordingly, the Court noted that "short of beginning to pave the easements or install the

17  utility lines on the easements, the Court can ascertain no next step that the Owners could

18  take before an actual case or controversy exists without potentially infringing the GRIC's

19  rights to the easements." (*Id.* at 11-12).

20     "Under the 'law of the case' doctrine, 'a court is generally precluded from

21  reconsidering an issue that has already been decided by the same court, or a higher court

22  in the identical case.'" *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997)

23  (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). "A court may have

24  discretion to depart from the law of the case where: 1) the first decision was clearly

25  erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is

26  substantially different; 4) other changed circumstances exist; or 5) a manifest injustice

27  would otherwise result." *Id.*

28     The GRIC does not contend that the Court's prior Order was clearly erroneous or

that the law regarding ripeness has changed; rather, the GRIC argues that three factual assertions that the Trustee previously made to the Court have since been proven to be inaccurate. (Doc. 396 at 6). The GRIC alleges that because the Court's prior Order depended upon these representations, the Court should conclude the scope of the easement issue remains unripe. (*Id.* at 3, 7).

First, the GRIC argues that contrary to the Trustee's prior statement that he had obtained an agreement from Johnson Utilities to provide water and sewer service to Section 16, the Trustee has since admitted that there is no such written agreement. (*Id.* at 7). Second, the GRIC contends that a preliminary lotting diagram for Section 16 prepared by a planning firm at the Trustee's direction inaccurately depicted access points to Section 16 and continued to inaccurately depict access points even after a subsequent revision. (*Id.*) Third, the GRIC alleges that discovery has now revealed numerous steps in the development process that the Trustee could undertake to develop Section 16 before resolving the issue of the scope of the easement, including completing the steps necessary for a tentative plat application to Pinal County. (*Id.* at 7-8).

None of these three points, however, show changed circumstances justifying a readjudication of ripeness. As the Court explained in its prior Order, the Trustee cannot obtain a development permit and a subdivision plat from Pinal County unless the subdivision has paved access and additional utility lines installed along the implied easements. (Doc. 332 at 9-10). Similarly, the Trustee also cannot submit even a *tentative* plat application to Pinal County unless there are established paved access rights and adequate utility lines to the proposed subdivision. (Doc. 402-1 at 3). The GRIC's arguments concern additional steps in the development process that are necessary to obtain final approval for the planned development; however, the GRIC ignores that expanding the existing easement into paved access is also necessary to obtain Pinal County approval. The GRIC has unequivocally refused to permit the Trustee to pave the existing easements, (Doc. 332 at 13), and offers no new evidence that they are now willing to permit improvement of the easements.

1    Therefore, although the GRIC is correct that a resolution of the scope of the
2    implied easements is not itself sufficient to permit development of Section 16, the Trustee
3    aptly points out that under the GRIC's argument, the Trustee could *never* obtain an
4    adjudication on the scope of the easements because completing the subdivision approval
5    process requires the Trustee to establish paved access and utilities.[1] (Doc. 401 at 6).
6    Accordingly, the GRIC has not shown changed circumstances such that the issue of the
7    scope of the easements is no longer ripe. The GRIC's extensive arguments to the contrary
8    are in the nature of a motion for reconsideration, and are not persuasive. The Court will
9    deny the GRIC's motion to dismiss for lack of subject-matter jurisdiction.

10   **IV.   SCOPE OF THE EASEMENTS**

11   The Trustee moves for summary judgment on its declaratory judgment claim
12   against the GRIC as to the rights of Section 16 with respect to the implied easement along
13   Murphy Road. (Doc. 392 at 1). Specifically, the Trustee asks the Court to declare that he
14   has the right to construct a two-lane, 40-foot wide paved roadway on Murphy Road from
15   the southern boundary of the Reservation to Casa Blanca Road as well as the right to
16   install utility lines underneath Murphy Road from the southern border of the Reservation
17   to the southeast corner of Section 16. (*Id.*)

18   **A.   Background**

19   The Court of Appeals has summarized the relevant facts concerning the creation of
20   the implied easement in favor of Section 16 as follows:

21   Through the 1853 Gadsden Purchase, the United States
     acquired title to land from Mexico, including what is now
22   Section 16. The following year, Congress adopted a law
     providing that when a survey was completed of the lands
23   within the purchased territory, "sections numbered sixteen
     and thirty-six in each township, in said Territory, shall be, and
24   the same are hereby, reserved for the purpose of being applied
     to schools in said Territory, and in the States and Territories
25   hereafter to be created out of the same." The lands were not

26   _____

27   [1] The evidence shows that utility providers, for example, will not commit to
     provide utilities unless there exists a right to install utility lines. (Doc. 402-1 at 5).
28   Similarly, a professional engineer has testified that a tentative plat cannot be prepared
     without having first established the rights for paved access and utilities. (Doc. 402-3 at 3-
     4).

1

2

3

4

> literally meant to be sites for school buildings. Instead, the state was able to sell and lease them to produce funds supporting its schools. In 1863, Congress partitioned the Territory of New Mexico to create the Territory of Arizona. Section 16 became property of Arizona when a survey of the land was filed in 1877.

5

6

7

8

9

*Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1065-66 (9th Cir. 2010) (citations omitted). Thus, the Court of Appeals held that the United States' grant to Arizona of Section 16 in 1877 at that time created an implied easement for the benefit of Section 16. *Id.* at 1073-74. This easement was "effectively conveyed to each subsequent purchaser." *Id.* at 1074.

10

11

12

13

14

15

Murphy Road, the access route at issue, is a north-south dirt road running adjacent to the eastern boundary of Section 16. (Doc. 278 at 7; Doc. 393 at 2). From the northeast corner of Section 16, Murphy Road extends two miles through the Reservation before intersecting with another road. (Doc. 278 at 7; Doc. 393 at 2). From the southeast corner of Section 16, Murphy Road extends approximately one-half mile through the Reservation before reaching the City of Maricopa. (Doc. 278 at 7; Doc. 393 at 2).

16

17

18

19

20

21

22

The Reservation district surrounding Section 16 encompasses 100 square miles and has 2,222 enrolled tribal members. (Doc. 400-1 Ex. 3). The area surrounding Section 16 is currently undeveloped and is planned for agricultural development, but the GRIC has no intention to ever change the land designations surrounding Section 16 from "open space" or "agricultural." (*Id.*) However, the City of Maricopa is separated from Section 16 by approximately a half-mile of Reservation and the City of Maricopa is undergoing rapid development. (Doc. 278 at 13-14).

23

24

25

26

The Trustee's current plan for developing Section 16 depicts 437 lots at a density of one house per 1.25 acres. (Doc. 396-2 Ex. 23). Section 16 is currently zoned by Pinal County as rural land, supporting a maximum development density of one house per 1.25 acres. (Doc. 393-1 Ex. 1 at 2-3).

27

### B.     Legal Standard

28

In the absence of contrary precedent, Arizona follows the Restatement (Third) of

Property: Servitudes (the "Restatement") with respect to the law of easements. *See Scalia v. Green*, 271 P.3d 479, 481 ¶ 9 n.1 (Ariz. Ct. App. 2011); *Paxson v. Glovitz*, 50 P.3d 420, 424 ¶ 21 n.3 (Ariz. Ct. App. 2002).

"[A]n implied easement is based on the theory that whenever one conveys property he includes or intends to include in the conveyance whatever is necessary for its beneficial use and enjoyment. The creation of easements by implication is an attempt to infer the intention of the parties to a conveyance of land. . . ." *Koestel v. Buena Vista Public Service Corp.*, 676 P.2d 6, 8 (Ariz. Ct. App. 1984); *see also* Restatement (Third) of Property: Servitudes § 4.1(1) (2000) [hereinafter Restatement] ("A servitude should be interpreted to give effect to . . . the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created.").

"The holder of an easement is entitled to use it 'in a manner that is reasonably necessary for the convenient enjoyment' of the easement or servitude." *Paxton*, 50 P.3d at 427 ¶ 36 (quoting Restatement § 4.10). "[T]he manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefitted by the servitude." *Id.* (quoting Restatement § 4.10). The holder "is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment." Restatement § 4.10.

When "the manner of the use" of an easement is changed, "or the intensity, or frequency of the use is increased, the change is permissible . . . only if the change is reasonably necessary to accommodate *normal development* of the dominant estate." *Id.* cmt. f (emphasis added). The manner in which the easement was created is relevant to determining whether the manner of use has changed. *See id.* As the Restatement explains, what constitutes normal development depends, at least in part, on the prior use of the dominant estate:

> Since land use normally evolves, what may be abnormal development at one time may become normal at a later time. The degree and abruptness of transition may be relevant factors in determining whether the dominant owner may

> continue using an easement after changing use of the dominant estate. A gradual transition from wilderness to agricultural to suburban subdivision might be considered normal, where an abrupt transition from wilderness to subdivision would not. In one case, a roadway easement could continue to be used by the dominant estate through all phases of its development, while, in the other, it could not be used to serve the subdivision.

*Id.* The nature of the easement is another factor in determining whether particular development of the dominant estate is normal development:

> Although generally easements are permitted to evolve along with the properties they serve, the outcome in individual cases may depend on how fast the transition is taking place in the area and whether the easement was created by grant or prescription. The degree of change permitted for a prescriptive easement is generally less than that for an expressly created easement. In balancing the interests of the dominant-and servient-estate holders, conservation and neighborhood preservation concerns should be relevant as well as developmental concerns.

*Id.* cmt. h.

## C.    Analysis

Because the Court of Appeals held that the United States implied an easement in its 1877 grant of Section 16 to Arizona, *Lyon*, 626 F.3d at 1073-74, the Court must determine the scope of the easement from the circumstances surrounding that grant, *see* Restatement § 4.1(1). At the outset, the Court notes the practical difficulty and uncertainty of divining the intent of Congress in 1877. Nevertheless, the Court will apply the Restatement, guided by decisions of other jurisdictions, to determine Congress's intent.

### 1.    Current Zoning

The Trustee first argues that because Congress granted Section 16 to Arizona for Arizona to use or sell to raise money for public schools, Congress intended that Section 16 be capable of its full economic development. (Doc. 392 at 10-11). Thus, the Trustee contends, Congress intended that Section 16 could be used in ways other than merely agricultural, including residential use to the extent permitted by zoning. (*Id.* at 11).

1    In support of his expansive view of Congressional intent, the Trustee relies upon
2    the Court of Appeals' statement in this case that land grants designed to aid state schools
3    are to "be construed liberally." (*Id.* at 11) (quoting *Lyon*, 626 F.3d at 1072)). The Trustee
4    also quotes this Court's prior Order, in which the Court remarked that access to Section
5    16 "cannot be 'so narrowly restrictive as to render the lands incapable of their full
6    economic development.'" (Doc. 278 at 25) (quoting *Utah v. Andrus*, 486 F. Supp. 995,
7    1009 (D. Utah 1979)). Contrary to the Trustee's conclusion, however, neither the Court
8    of Appeals' interpretation of school land grants nor this Court's prior statements support
9    the conclusion that the scope of the easement necessarily grows to encompass current
10   zoning restrictions.

11   The Court of Appeals discussed the liberal construction of land grants in the
12   context of distinguishing grants intended to aid schools from federal land grants in
13   general, noting that "[c]ourts normally construe federal land grants narrowly, under a
14   longstanding rule that unless the language in a land grant is clear and explicit, the grant
15   will be construed to favor the [granting] government so that nothing passes by
16   implication." *Lyon*, 626 F.3d at 1072 (internal quotation marks omitted). Although the
17   court then noted the exception that lands grants are to be liberally construed when "the
18   land grant at issue was made pursuant to legislation of Congress designed to aid the
19   common schools of the states," *id.* (internal quotation marks omitted), it did so only for
20   the purpose of determining "whether the federal government's conveyance of Section 16
21   to Arizona, as part of a school land grant, included an implied easement," *id.* The liberal
22   construction of land grants applied only in determining whether an implied easement
23   existed, not its scope. *See id.* at 1074 (declining to opine on the scope of the easement).

24   Nor does *Andrus*, quoted in the Court's prior Order, link the scope of an easement
25   to zoning permissions. In *Andrus*, the putative dominant estate had been the subject of a
26   school land grant to the state and was surrounded by federal land. 486 F. Supp. at 1000,
27   1002. The court found an implied easement existed in favor of the school-grant land, *id.*
28   at 1002, and noted that because Congress intended that the land be used to raise state

revenue, "the access rights of the state cannot be so restricted as to destroy the lands' economic value. That is, the state must be allowed access which is not so narrowly restrictive as to render the lands incapable of their full economic development." *Id.* at 1009.

The Trustee asks the Court to read *Andrus* no further and conclude that full economic development means any development permitted by current zoning. But the *Andrus* court also held that "it is consistent with common law property principles to find that the United States, as the holder of the servient tenement, has the right to limit the location and use of Utah's easement of access to that which is necessary for the state's reasonable enjoyment of its right." *Id.* The court concluded that the federal government could regulate the manner of access to the dominant estate. *Id.* Thus *Andrus* does not stand for the proposition that the owner of the dominant estate may develop his land to the extent permitted under the zoning laws; rather, *Andrus* merely provides that the land may be reasonably enjoyed pursuant to its full economic *development*. Read in conjunction with the Restatement's emphasis upon normal development, it is clear that development means normal change-of-use patterns and zoning restrictions are not dispositive (although zoning may be evidence of what is considered normal development). *See* Restatement § 4.10 cmt. f.

## 2. Residential Use

Having established that the scope of the easement does not depend upon the current zoning of Section 16, the Court turns to the issue of whether residential use is a permissible use of the easement. *See* Restatement § 4.10 cmt. d ("The first step in determining whether the holder of an easement is entitled to make a particular use challenged by the owner of the servient estate is to determine whether the use falls within the purposes for which the servitude was created."). The GRIC contends that Congress intended Section 16 to be used for only agricultural purposes and therefore the easement is limited to uses necessary to support such agricultural use. (Doc. 399 at 8-10).

The GRIC's argument is both muddled and unpersuasive. Essentially, the GRIC

argues that because the Enabling Act (which allowed Arizona to become a state) permitted Arizona to lease school sections "in such manner as the legislature of the state of Arizona may prescribe, for grazing, agricultural, commercial, and domestic purposes," and Arizona subsequently decided that land leased for one purpose could not be used by the lessee for another purpose, Congress intended that Section 16 be used only for continuing agricultural purposes as it was in 1877. (Doc. 8-10). This argument fails for several reasons.

First, there is no evidence that Section 16 was used for agricultural purposes in 1877. The only evidence shows that portions of Section 16 have been farmed "since at least the 1940s." (Doc. 278 at 9). Thus, to the extent agricultural use of Section 16 is a use not existing in 1877, this evidence supports the proposition that Section 16 may develop from one land use to another. Second, although the GRIC is correct that a lessee of Arizona trust land may use the land for only the purpose for which the land was leased, *see* A.R.S. § 37-281, the subsequent actions of the Arizona legislature in restricting the leased use of state trust land bear no relationship to the intent of Congress in conveying that land thirty-five years prior to statehood. Third, although the Enabling Act was enacted in 1910 (thirty-three years after Section 16 was granted to Arizona), it provided that state trust land could be sold, which implies that the purchaser would have unrestricted use of the land. *See* Enabling Act, ch. 310, § 28, 36 Stat. 568 (1910). To the contrary, the Enabling Act demonstrates that Congress, at least in 1910, wanted to maximize the value of school sections by ensuring that they were sold to the "highest and best bidder." *Id.*

Thus, nothing in either the Enabling Act or the Arizona legislature's subsequent acts establishes that Congress's intent in 1877 was to restrict the future use of Section 16 to agricultural uses. The reasonable inference from Congress's grant of Section 16 is that Congress intended Section 16 to enjoy an easement commensurate with the most productive use of the property as it developed. This comports with the law of easements.

### 3.     Normal Development

The scope of an easement is not static but rather changes as "reasonably necessary to accommodate normal development of the dominant estate." Restatement § 4.10 cmt. f. Thus, although an easement may initially be used for agricultural use, it is not limited to that use if normal development results in a residential use of the dominant estate. *See id.* ("A gradual transition from wilderness to agricultural to suburban subdivision might be considered normal, where an abrupt transition from wilderness to subdivision would not.").

The parties dispute whether a change in use of Section 16 from agricultural to residential constitutes "normal development." (Doc. 392 at 13; Doc. 399 at 10). The GRIC contends that because it intends to maintain the surrounding Reservation land as open or agricultural, the development of Section 16 at one house per 1.25 acres is abnormal and "an abrupt and drastic departure from the longstanding pastoral nature" of the area. (Doc. 399 at 14). The GRIC estimates that the proposed 440 homes in Section 16 will add more than 1,000 residents to the area; it asserts this is abnormal because only approximately 2,222 tribal members live in the surrounding 100 square miles of Reservation. (*Id.* at 13-14).

The GRIC's emphasis on its use of Reservation land misstates the test for determining the scope of an easement. The issue is whether the scope of the easement is reasonably necessary to "accommodate normal development *of the dominant estate*." *See* Restatement § 4.10 (emphasis added). Here, the evidence shows the use of Section 16 has transitioned since 1877 from open space ("wilderness") to agricultural in the 1940s to dairy operations (a more industrial agricultural use than simple farming). The transition from agricultural dairy use to rural housing is not only normal development but abnormally *slow* development. The City of Maricopa is located approximately one-half mile away and has undergone rapid development. The Court cannot imagine a smaller developmental step than the transition from a dairy farm to rural housing with one house per 1.25 acres. Although Section 16 could conceivably be subdivided into still fewer lots

1   than the 437 planned, the existing Pinal County rural zoning appears to contain the

2   planned development to a normal pace.[2]

3       The GRIC is correct that the Trustee's proposed development of Section 16 is

4   abrupt and abnormal compared to the surrounding Reservation. *See* (Doc. 399 at 14). But

5   there are two critical flaws in the GRIC's conclusion; first, development is measured by

6   the dominant and not the servient estate. *See* Restatement § 4.10. Second, the GRIC's use

7   of the surrounding Reservation constitutes abnormally slow development. The GRIC

8   admits that it intends to stagnate development by always maintaining the surrounding

9   land as open or agricultural in nature. Although the GRIC has the sovereign right to

10  develop or not develop its land as it best sees fit, it cannot use its abnormal lack of

11  development as justification for mischaracterizing normal development as "abrupt." To

12  hold otherwise would permit the servient estate holder to undermine the easement

13  holder's rights created at the time of the conveyance simply by choosing to forego normal

14  development on its property.[3]

15  
16      [2] Illustration 14 to Restatement § 4.10 is particularly illustrative:

17          O, the owner of Blackacre, conveyed a 60-foot-wide
            easement to Able, the owner of Whiteacre, a 40-acre parcel of
18          undeveloped property in a rural area close to the suburbs of a
            major city. Ten years later Whiteacre was subdivided into 160
19          lots. The developer plans to improve the easement to provide
            primary access to the subdivision. In the absence of other
20          facts or circumstances, the easement can be improved to serve
            the subdivision because the change from rural to suburban is
21          normal development, and the width of the easement suggests
            that a substantial increase in use was contemplated by the
22          parties.

23  Restatement § 4.10 illus. 14. Although in this illustration the easement is express, in the

24  present case Congress intended the scope of the implied easement to accommodate

25  normal development.

26      [3] Under the GRIC's view, for example, if a neighboring dominant and servient
    estate in New York's Times Square were both single-family residences that had never
27  been further developed, the owner of the dominant estate could never develop the
    property commercially regardless of the surrounding environment simply because the
28  owner of the servient estate refused to develop his property. Such a result would be
    absurd.

1    Accordingly, the Trustee's proposed use of the easement for the development of

2    Section 16 for rural residential use with one house per 1.25 acres is a manner reasonably

3    necessary for its convenient enjoyment. This finding is not sufficient to grant the

4    Trustee's requested relief, however.

5    **4.        Unreasonable Damage or Interference to the Reservation**

6    The holder of an easement, although entitled to use the easement as reasonably

7    necessary for the convenient enjoyment of the dominant estate, "is not entitled to cause

8    unreasonable damage to the servient estate or interfere unreasonably with its enjoyment."

9    Restatement § 4.10. This principle is at the core of GRIC's complaint regarding the

10   proposed improvements to Murphy Road. The GRIC implies that the increase in

11   population and traffic would have detrimental effects to the surrounding Reservation

12   roads and property, (Doc. 399 at 13-14), although it offers no specific argument on this

13   point.

14   The Court cannot conclude on the present record whether use of the easement

15   consistent with development of Section 16 at one house per 1.25 acres would cause

16   unreasonable damage to the Reservation or interfere unreasonably with its enjoyment.

17   This is a factual question requiring the Court to consider the increased traffic to the

18   surrounding roads, vehicle noise, aesthetics of the area, and the character of the

19   surrounding property, among other considerations. *See* Restatement § 4.10 cmt. h ("What

20   constitutes unreasonable interference will depend largely on the circumstances . . .").

21   Although the Court has previously issued factual findings concerning the increased traffic

22   and issues with the Gila River Police Department's ability to handle such traffic, these

23   facts assume a 3.5 house per acre density, which is over four times as many houses as the

24   Trustee now proposes to construct. *See* (Doc. 278 at 13, 15). Thus, these findings do not

25   aid the Court in its present analysis.

26   The Court will deny summary judgment on this issue. At trial, the Trustee must

27   show that the traffic and other effects associated with an increased number of vehicles

28   using Murphy Road does not unreasonably interfere with the GRIC's enjoyment of its

1    Reservation or cause unreasonable damage to the Reservation.

2            **5.      Other Issues**

3            Although the Court declines to rule at this time on the ultimate issue of whether

4    the scope of the easement includes a paved 40-foot wide access road with underground

5    utilities carrying the daily traffic of a 437 lot residential development, the Court may

6    properly decide narrower issues related to the easement's scope, such as the installation

7    of underground utilities as well as the size and type of the roadway.

8            **a.      Underground Utilities**

9            The Trustee seeks to install underground utilities in the easement underneath

10   Murphy Road. The GRIC does not dispute that the easement may be used for ingress and

11   egress, but asserts that the Trustee has not presented sufficient evidence that the easement

12   was created to support the installation of underground utilities or of the precise location

13   of such utilities. (Doc. 399 at 11 n.11; Doc. 396 at 16).

14           Courts have regularly upheld the rights of holders of implied easements to install

15   underground utilities in their easements. *See, e.g.*, *Reece v. Smith*, 594 S.E.2d 654, 657-

16   58 (Ga. Ct. App. 2004) ("The implied easement . . . was not strictly limited to [the]

17   original use of the easement for ingress and egress, but is available for uses that are

18   necessary to the reasonable enjoyment of any lawful development of the land, and that do

19   not unreasonably burden" the rights of the owners of the servient estate). *United States v.*

20   *176.10 Acres of Land*, 558 F. Supp. 1379 (D. Mass. 1983) is particularly illustrative.

21   There, the issue was whether an implied easement created in 1852 permitted the

22   construction of a driveway and underground utilities for use by a new residential

23   dwelling. 558 F. Supp. at 1380. The court concluded that it was "reasonable to assume

24   that the parties foresaw residential use of the landlocked parcel as a probable use and that

25   use would today include utilities as well as a driveway." *Id.* at 1382. Thus, because

26   residential use was foreseeable to the parties in 1852, "use of the easement appropriate to

27   permit residential use of the dominant estate is, therefore, appropriate today." *Id.* at 1381.

28           Similarly, the Trustee is entitled to use the easement for the reasonable enjoyment

of Section 16 so long as his use does not unreasonably burden the Reservation. Because Section 16's normal development includes residential use, and residential use now involves utility service, the Trustee is entitled to use the easement for installation of utility lines so long as this use does not unreasonably burden the Reservation. The Court concludes that the installation of utility lines, regardless of their size or number, will not unreasonably burden the Reservation because the lines will not be visible and will occupy otherwise unused underground space within the easement under Murphy Road. Consequently, the easement permits the Trustee to install underground utility lines under the boundaries of Murphy Road.

### b.    Dimensions and Paving of the Easement

The GRIC argues that the Trustee's proposed dimensions for the Murphy Road easement, 40-foot in width, would "drastically alter the current width of the road." (Doc. 399 at 13). The evidence shows that the traveled surface of Murphy Road varies between 17 and 29.5 feet in width, excluding shoulder areas. (Doc. 393-4 Ex 4 Ex. A at 2 n.2; 400-1 Ex. 1 at 49:21-23). The shoulder area varies between 6 to 12 feet, thus adding between 12 to 24 feet to the road's width. (Doc. 404-1 Ex. 1 at 2-3).

The permissible dimensions of an easement "are those reasonably necessary" for its enjoyment:

> If the dimensions are not specified, the owner of the servitude may use so much of the servient estate as reasonably necessary to carry out the intended purpose. The dimensions of the servitude may change over time as reasonably needed to accommodate changing needs of the servitude owner and changes in technology, limited by the proviso, however, that changes that would unreasonably increase the burden on the servient estate are not permitted.

Restatement § 4.8 & cmt. d.

In this case, the GRIC fails to point to any evidence other than its bare assertion that the width of Murphy Road would be "drastically alter[ed]" that supports the conclusion that a 40-foot wide easement is either not reasonable in light of the normal development of Section 16 or would unreasonably increase the burden on the servient

estate.[4] Because Murphy Road presently approximates forty feet in width including the traveled surface and shoulder areas, it would not unreasonably increase the burden on the Reservation to fix the road's width at forty feet including shoulders, as the Trustee has requested. Moreover, the Trustee has presented uncontroverted evidence that such a width is necessary for the development of Section 16 at one house per 1.25 acres. The GRIC even asserts that the Trustee may need a significantly wider easement to accommodate Pinal County requirements. (Doc. 399 at 2).

Similarly, the Trustee may pave Murphy Road. "Frequently, reasonably necessary uses [of an easement] will also include making improvements or constructing improvements for use of the easement." Restatement § 4.10 cmt. c. Congress intended that Section 16 would undergo normal development, and such development includes the improvements of roads. Paving a roadway is a reasonable improvement. *See Hayes v. Aquia Marina, Inc.*, 414 S.E.2d 820, 823 (Va. 1992).

The Court emphasizes that its determinations regarding paving and the width of Murphy Road are not themselves dispositive of the Trustee's requested relief. In other words, although a road is often paved for the purpose of supporting increased traffic, the Court is not in this Order declaring that the easement supports increased traffic. Indeed, unless the Court concludes at trial that the easement supports increased traffic, paving a 40-foot wide Murphy Road would provide negative utility to the Trustee because he would expend money to do so but he could not use the road to support his desired level of traffic. The Court believes a showing of the level of traffic on Murphy Road and its attendant effects under the Trustee's proposed development is dispositive as to the ultimate relief sought: a declaration that the easement supports a paved, 40-foot wide Murphy Road with underground utilities carrying the traffic of development of Section 16 at a density of one house per 1.25 acres. This depends upon the Trustee's success at

---

[4] The GRIC also asserts that the "location of the proposed paved road is unknown." (Doc. 396 at 16). But the evidence clearly shows that the Trustee intends to improve Murphy Road, and the location of Murphy Road is known. (Doc. 396-1 Ex. 14 at 2-3).

1    trial.

2    **V.      RETAINED JURISDICTION**

3           The Trustee asks the Court to retain jurisdiction after entering judgment in this

4    case "in case Pinal County determines that any additional improvements are necessary."

5    (Doc. 392 at 1). The Trustee offers no authority supporting the proposition that the Court

6    may retain jurisdiction subsequent to entry of a final judgment. To the contrary, Rules 59

7    and 60 provide narrow mechanisms by which a party may move to alter or set aside a

8    judgment within a limited time period following its entry. *See* Fed. R. Civ. P. 59(e), 60.

9    Retaining jurisdiction after entry of final judgment would be inconsistent with these rules

10   and principles regarding the finality of judgments. The Court denies the Trustee's

11   request.

12   **VI.     CONCLUSION**

13          Congress intended at the time of granting Section 16 to Arizona to permit the

14   owner of Section 16 to access the property in a manner commensurate with its normal

15   economic development. Because a transition from an agricultural farm use to rural

16   residential is normal development, the Trustee is entitled to improve the easement along

17   Murphy Road to a 40-foot wide paved roadway.

18          However, the Court cannot determine on the present factual record whether the

19   Trustee may use such a roadway for the purpose of supporting a residential development

20   with one house per 1.25 acres. At a bench trial, the Trustee must prove that the traffic and

21   other attendant effects from such a use will not cause unreasonable damage to the

22   Reservation or interfere unreasonably with the GRIC's enjoyment of the Reservation.

23          For the foregoing reasons,

24          **IT IS ORDERED** that the Stipulation to File Select Summary Judgment Exhibits

25   and Accompanying References Under Seal (Doc. 394) is denied. The lodged sealed filing

26   (Doc. 395) is stricken but shall remain under seal. The Court has not considered the

27   sealed filing (Doc. 395) in making its determination.

28          **IT IS FURTHER ORDERED** that Gila River Indian Community's Motion to

1    Dismiss (Doc. 396) is denied.

2        **IT IS FURTHER ORDERED** that Gila River  Indian Community's Motion for

3    Summary Judgment (Doc. 396) is denied.

4        **IT IS FURTHER ORDERED** that the Trustee's Motion for Summary Judgment

5    Regarding Scope of Implied Easement (Doc. 392) is granted in part and denied in part.

6        Dated this 15th day of May, 2014.

7

8

9

10                                    James A. Teilborg
                                 Senior United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28