**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>Michael Keith Schugg, dba Schuburg Holsteins,<br><br>     Debtor,<br><br>In re:<br><br>Debra Schugg,<br><br>     Debtor,<br><br>G. Grant Lyon in his capacity as Chapter 11 Trustee of the bankruptcy estate of Michael Keith Schugg and Debra Schugg; Wells Fargo Bank,<br><br>     Plaintiffs,<br><br>v.<br><br>Gila River Indian Community,<br><br>     Defendant. | No. CV-05-02045-PHX-JAT<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

A farmer owns a parcel of land located approximately one-half mile from city limits, accessible only via an easement across another landowner's land. The farmer wishes to build a rural housing subdivision on his property, but the other landowner refuses to consent to the development. The question presented is whether the scope of the existing easement permits the increased access necessary to support the proposed subdivision. For the reasons that follow, the Court concludes that the easement permits

such a use.

## I.    Background[1]

The property at the core of this case is a privately-owned parcel of approximately 657 acres legally known as Section 16 of Township 4 South, Range 4 East of the Gila and Salt River Base and Meridian ("Section 16"). Section 16 is located in Pinal County, Arizona but is surrounded by an Indian reservation.

### A.    Procedural History

In 2001, the owners of Section 16 constructed a dairy on the property. In 2003, Section 16 was conveyed to Michael Schugg and Debra Schugg (the "Schuggs"). The Schuggs declared bankruptcy in 2004, and listed Section 16 as an asset. Plaintiff G. Grant Lyon was appointed the Chapter 11 Trustee of the Schuggs' bankruptcy estate (the "Trustee"). During the Schuggs' bankruptcy proceedings, Defendant Gila River Indian Community ("the Community") filed a proof of claim asserting that it was the rightful owner of Section 16 based upon, among other arguments, aboriginal title. "In response, the Trustee initiated an adversary proceeding seeking a declaratory judgment that the Schuggs' estate had legal title and access to Section 16." *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1066-67 (9th Cir. 2010). The parties agreed to withdraw the bankruptcy reference, and this case was transferred to the Court.

The Court granted partial summary judgment for the Trustee, ruling that the Community did not hold aboriginal title to Section 16. Following a bench trial, the Court issued findings of fact and conclusions of law in which it found the Trustee could legally access Section 16 because of the existence of an implied easement over the Community's reservation (the "Reservation"). (Doc. 278). The Court declined the Trustee's invitation to rule on the scope of the implied easement, concluding that this issue was not ripe because the Trustee had failed to show the easement was inadequate for the present use

---

[1] The Court includes only that background information relevant to this Findings of Fact and Conclusions of Law. Additional background information is in the Ninth Circuit Court of Appeals' decision, 626 F.3d 1059 (9th Cir. 2010) as well as the Court's most recent ruling on summary judgment, (Doc. 407).

of Section 16. (*Id.* at 26). On appeal, the Ninth Circuit Court of Appeals ("Court of Appeals") affirmed the Court's rulings concerning aboriginal title, the existence of an implied easement, and the lack of an actual controversy concerning the scope of such easement.[2] 626 F.3d at 1074, 1079.

The parties initially agreed that no issues remained for determination following the remand from the Court of Appeals. However, the Court subsequently determined, at the Trustee's urging, that the issue regarding the scope of the easement was now ripe because the Trustee presented evidence that he intended to improve the easements pursuant to a specific development plan and the Community had denied permission to make those improvements. Specifically, the Trustee intends to construct a rural residential subdivision on Section 16 at a density of 1 house per 1.25 acres (approximately 440 houses). The Court postponed the entry of judgment and set a Rule 16 hearing on the issue of easement scope.

The Trustee moved for summary judgment, asking the Court to declare that he has the right to construct a two-lane, 40-foot wide paved roadway on the dirt road along the eastern boundary of Section 16 (Murphy Road) as well as the right to install utility lines underneath the roadway from the southern border of the Reservation to the southeast corner of Section 16. The Court granted the Trustee's motion in part and denied it in part. In particular, the Court concluded that the Trustee had presented uncontroverted evidence that the easement permitted the installation of underground utility lines under the boundaries of Murphy Road[3] and a 40-foot wide roadway was necessary for the planned

---

[2] The Court of Appeals also vacated and remanded in part on other issues not relevant here.

[3] While researching this Findings of Fact and Conclusions of Law, the Court encountered an Arizona case relevant to the Court's prior summary judgment order concerning underground utilities. Because an Arizona case particularly supports the Court's conclusion, and the Court previously cited only out-of-state cases, the Court mentions it here. In *City of Chandler v. Arizona Department of Transportation*, 231 P.3d 932, 935-36 ¶ 13 (Ariz. Ct. App. 2010), the Arizona Court of Appeals held that "[g]enerally, a roadway easement includes any subsurface rights incident to use of the surface, such as a foundation for the surface or drainage systems, and substantial rights in the subsurface for purposes of utilities."

development of Section 16. The Court concluded, however, that there remained a genuine issue of material fact as to whether the scope of the implied easement permitted the volume of traffic on Murphy Road that a 440-house subdivision on Section 16 would generate. (Doc. 407).

The Court held a bench trial and the parties submitted post-trial briefs on all issues. (Docs. 468, 470, 471, 472). Having considered the bench trial, closing arguments, and post-trial briefing, the Court finds and concludes as follows:

## II.    Findings of Fact[4]

### A.    Section 16's Geographic Relationship to the Reservation

The Reservation is approximately 600 square miles in size and is divided into seven districts. District 5 is approximately 100 square miles in size, and includes Section 16 near the Reservation's western boundary. The western boundary of the Reservation (and of District 5) is approximately one-half mile west of Section 16. The City of Maricopa, Arizona ("Maricopa") is approximately two miles further west from the Reservation's western boundary. The southern boundary of the Reservation (and of District 5) is approximately one-half mile south of Section 16. Maricopa is immediately south of the Reservation's southern boundary.

Two roads provide physical access to Section 16, Murphy Road and Smith-Enke Road. Murphy Road is a north-south road that runs along the eastern boundary of Section 16. Traveling south from the southeastern corner of Section 16, Murphy Road continues to Maricopa. Traveling north from the northeastern corner of Section 16, Murphy Road intersects with Casa Blanca Road after approximately two miles. Smith-Enke Road is an east-west road that runs along the southern boundary of Section 16. Traveling west from the southwestern corner of Section 16, Smith-Enke Road continues to Maricopa. Traveling east from the southeastern corner of Section 16, Smith-Enke Road changes its name to Seed Farm Road and continues to the town of Sacaton.

---

[4] The parties have stipulated that all facts previously found by the Court in the first trial are uncontested and admitted in the present trial. *See* (Doc. 424 at 3). The Court restates some of these facts where appropriate to provide helpful context.

Although Section 16 is located within the outermost boundaries of the Reservation, the Community's police and fire departments have no obligation to serve Section 16.

## B. Existing Reservation Roadways

Casa Blanca Road is an east-west road north of Section 16 that runs, in relevant part, between Interstate 10 ("I-10") and Arizona State Route 347 ("SR 347"). The intersection of Murphy Road and Casa Blanca Road is a few miles east of SR 347 and about five miles west of I-10. Casa Blanca Road is a public road and may be traveled by non-members of the Community. I-10 and SR 347 are each four-lane paved highways running north-south through the Reservation; both connect to Casa Blanca Road at interchanges. Casa Blanca Road is also the main connector between different areas of the Reservation.

Because SR 347 connects Maricopa to Phoenix (which is north of the Reservation), some Maricopa residents use SR 347 to commute to Phoenix. As of 2011, SR 347 carries an average of 41,000 trips per day, and this is expected in the future to increase to 105,000 daily trips. The I-10 and Casa Blanca Road interchange also connects with Arizona State Route 587 ("SR 587"), which runs north to the city of Chandler. As of 2011, over 65,000 vehicles per day pass along the corridor containing the Casa Blanca Road/I-10/SR 587 interchange.

The Reservation has other access points to I-10 via Sundust Road, Queen Creek Road, and Riggs Road. As of 2011, the portion of Riggs Road between SR 347 and I-10 averaged 6,000 trips per day. As of 2011, the Queen Creek Road/SR 347/I-10 interchange averages 28,000 trips per day.

## C. Present Condition of Murphy Road

The length of Murphy Road running from Maricopa to Casa Blanca Road is a dirt roadway. The road suffers from washboarding (perpendicular bumps) as well as rutting (longitudinal marks). At times, the road's poor condition forces vehicles to drive on the shoulder. Vehicles traveling on Murphy Road also generate noise as they chatter and

bounce along the imperfections of the dirt roadway. Each vehicle creates airborne dust that suspends in the air for a time after the vehicle passes. The farmer-owner of Section 16 has observed twenty to twenty-five cars using Murphy Road in a half-hour to hour period of time when a nearby proving ground changes shifts. Tractors and semis also use Murphy Road, and deliver supplies to the farm on Section 16. When the semis use Murphy Road, they generate loud noises because the aluminum body of the trucks rattles upon striking the roadway's bumps.

The dairy farm on Section 16 operates 24 hours per day, 7 days per week, and ships five loads of milk each day. Vendors usually make route trips once per week to the farm, and one or two additional visits if they are delivering supplies.

**D.     The Community's Present Use of the Land Surrounding Section 16**

The Reservation land immediately surrounding Section 16 is not highly developed. Agricultural land surrounds the south and west sides of Section 16, while the land to the north and east of Section 16 is either desert or undeveloped. Farms exist on both sides of Murphy Road south of Section 16, and a number of irrigation canals intersect Murphy Road. These canals include laterals, which are distribution canals carrying water from main canals to a point of delivery. The routine operation and maintenance of the laterals requires that irrigation operators cross Murphy Road to adjust the flow of water, among other tasks. The current volume of traffic on Murphy Road is sufficiently low such that irrigation operators have essentially unfettered access to cross the road to perform their duties.

Residential and public land uses exist further away from Section 16. For example, the village of Casa Blanca is located along Casa Blanca Road between SR 347 and I-10. This area includes schools, a senior center, and a service center. The schools are located to the east of Murphy Road, and portions of Casa Blanca Road near the schools are designated as school zones with greatly reduced speed limits. Houses also exist north of Casa Blanca Road and to the west of Murphy Road.

### E.      Effects of Traffic from the Increased Use of Murphy Road

The construction of approximately 440 houses on Section 16 will cause additional traffic on Murphy Road. In addition to the traffic from the residents of Section 16, some Maricopa residents may use a paved Murphy Road as a shortcut to reach Phoenix, traveling north on Murphy Road to Casa Blanca Road, then traveling east on Casa Blanca Road to reach I-10. Presently, Maricopa residents do not use this shortcut because the dirt condition of Murphy Road is not conducive to commuting and also because Casa Blanca Road has a low speed limit.

Paving Murphy Road to support the traffic from future residents of Section 16 will affect the operation of the irrigation canals intersecting the roadway.[5] The irrigation crossings will have to be reworked to accommodate the paved road as well as underground utilities. The irrigation owner may also have to install safety devices to prevent people who fall into the canal from being pulled through the siphon crossings, and install fences to prevent people driving down the operation and maintenance roads next to the canals.

Additional traffic on Murphy Road may also delay irrigation operators crossing the road to perform their routine tasks. Operators may have to wait for a break in traffic to cross the road, and there could be an increased risk of an accident if large, slow-moving equipment has to cross Murphy Road to turn around. The irrigation owner could eliminate this risk by setting back the water facilities beyond the right-of-way of Murphy Road so that irrigation operators could turn around without having to enter onto the roadway. Nevertheless, if the irrigation owner installs fences on the operation and maintenance roads, operators will suffer additional delays in opening and closing these fences.

Although the additional traffic on Murphy Road resulting from development of

---

[5] The testimony of the Community's witness Daniel Long on this topic is unclear as to whether his conclusions (in particular, delays to irrigation operators due to increased traffic) are based upon only the traffic from residents on Section 16 or are based upon aggregate traffic assuming Maricopa residents also cut through on Murphy Road.

Section 16 will adversely impact irrigation owners and operators, other canals on the Reservation already cross roadways of greater size and traffic than Murphy Road. For example, the South Side Canal and the Casa Blanca Canal both intersect the I-10 and flow underneath the interstate. The Casa Blanca Canal passes within a mile of Section 16 and flows through the town of Sacaton, which is within the Reservation. There are also a number of other canals that cross paved roadways within the Reservation.

If Section 16 is developed and Murphy Road is paved, the Trustee—not the irrigation owner—bears the expense of designing and constructing reworked irrigation canals so as to not adversely impact the irrigation network. As part of the development approval process, the irrigation district must approve the canal crossings and facilities, and municipalities require irrigation district approval prior to the ultimate approval of a development plan.

### F.      The Community's Plans for the Land Surrounding Section 16

The Community intends to develop certain areas of District 5 as residential areas while preserving other areas as undeveloped or agricultural land. The Community's goal is to keep cut-through traffic away from its residential developments. Additionally, residents have identified dust from traffic on unpaved roadways as a key health issue and the Community is presently undertaking to pave roads adjacent to residential areas.

Houses already exist north of Casa Blanca Road, and District 5 residents have asked for new housing as a critical community need. The Community has designated the area north of and along Casa Blanca Road as residential with a density of up to 3.5 homes per acre, capable of accommodating between 2,554 and 10,217 homes. Despite this vision for development (which is not a concrete plan), the Community is also concerned with preserving the peaceful, rural character of District 5. The Community is highly concerned with cut-through traffic originating and ending outside of the Reservation, and has identified cut-through traffic on Casa Blanca Road as a particular concern.

The Community is also considering a potential interchange between I-10 and Seed Farm Road. The Community believes over 22,000 vehicles per day could enter and exit I-

10 at this interchange, which would give Seed Farm Road an "expanded regional role" as well as provide the Community the opportunity to provide commercial and motorist services.

Aside from the proposed Seed Farm Road interchange, the Community intends to maintain much of the southern area of District 5 as agricultural or open space, including the area near Section 16.

## III.   Analysis & Conclusions of Law

### A.   Testimony from the 2007 Bench Trial

The Trustee's arguments at trial and in post-trial briefing rely, in part, upon testimony received by the Court during the first trial in this case. (Tr. 2/23/15 AM at 23; Doc. 468 at 1). The Trustee believes that this testimony is part of the record of this case, automatically admitted for purposes of the present trial. (Tr. 2/23/15 AM at 23). The Community argues that this testimony is inadmissible because the Trustee never moved during the present trial for its admission and testimony from a prior trial is not automatically admitted in a subsequent trial within the same case. (Doc. 470 at 2).

A court must consider only admitted evidence in making its rulings, and the Trustee did not move during the present trial to admit this prior testimony. Therefore, if this prior testimony *was* admitted in the present trial, its admission could have occurred only by virtue of its admission during the first trial. Practically speaking, this requires the Court's evidentiary rulings during the first trial to be binding upon the Community in the present trial. In other words, the actual issue is whether the principle of collateral estoppel applies to evidentiary rulings such that parties to a trial are bound by the Court's admission of evidence received in an earlier trial involving the same parties.

### 1.   Collateral Estoppel

The collateral estoppel doctrine prevents the relitigation of issues "conclusively determined in a prior action." *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010) (quoting *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984)). "Federal law governs the collateral estoppel effect of a case decided by a federal court." *Trevino v.*

*Gates*, 99 F.3d 911, 923 (9th Cir. 1996). Under federal law, a party is precluded from relitigating an issue if: "(1) the issue at stake [is] identical to the one alleged in the prior litigation; (2) the issue [was] actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation [was] a critical and necessary part of the judgment in the earlier action." *Id.* (quoting *Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir. 1993)).

Collateral estoppel extends to both ultimate facts (i.e. facts essential to the claim) as well as evidentiary facts from which a court infers ultimate facts. *See United States v. Castillo-Basa*, 483 F.3d 890, 897 n.4 (9th Cir. 2007); *see also United States v. Hernandez*, 572 F.2d 218, 221 n.3 (9th Cir. 1978) ("An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law."); Restatement (Second) of Judgments § 27 cmt. c (1982); *Loera v. United States*, 714 F.3d 1025, 1030 (7th Cir. 2013) (Posner, J.) (". . . the evidentiary ruling that the judge made in that first proceeding should be given collateral estoppel effect").

However, collateral estoppel is "inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding." *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997). Moreover, the party asserting collateral estoppel bears the burden of proving the doctrine's application is appropriate. *Pardo v. Olson & Sons, Inc.*, 40 F.3d 1063, 1066 (9th Cir. 1994).

### 2.      Analysis

Here, there is no doubt that the parties litigated the issue of admissibility in the first trial, and because the same testimony is at issue, the question of admissibility is identical between trials. But the Trustee, as the party seeking to apply collateral estoppel, bears the burden of showing that the Court's admissibility rulings in the first trial were a "critical and necessary part of the judgment." The Trustee has not satisfied this burden. The Court's prior judgment concluded that the United States was not an indispensable party to this case, the Trustee was entitled to legal access to Section 16 via an implied

easement and a public roadway, there was no trespass on the Reservation, and the issue of whether the Community had zoning authority over Section 16 was not ripe for decision. *Lyon*, 626 F.3d at 1067.

The Trustee has not even attempted to show that the proffered testimony was critical and necessary to the Court reaching any of these conclusions, and for that reasons alone, the Trustee has failed to carry his burden. Nevertheless, the Court has independently reviewed the entirety of the transcripts containing the testimony sought to be used by the Trustee in the present trial. The Court finds none of it to have been necessary to the final judgment entered in this case following the first trial. The testimony pertains to the character of the Reservation land surrounding Section 16 and traffic volumes on the surrounding roads. None of this was necessary to the Court's conclusions. Indeed, the fact that the Trustee relies upon this testimony as evidence relating to the proper scope of the implied easement and the Court expressly found at the time of the first trial that this issue was not yet ripe further demonstrates the failure of this testimony to have been necessary to the final judgment following the first trial.

The Trustee unconvincingly cites to a number of authorities involving different procedural postures than the present case. (Doc. 468 at 2). The Trustee's citations to Federal Rules of Civil Procedure ("Rules") 59 and 65 are inapposite because the present trial is neither the product of a motion for new trial following the first trial nor a trial following a motion for a preliminary injunction. The Trustee also argues that because the Court must base its factual findings upon the evidence in the "entire" record, the Court must consider the testimony from the first trial. (Doc. 468 at 2) (citing *Morrow v. Martschink*, 922 F. Supp. 1093, 1102 (D.S.C. 1995)). But *Morrow* merely recites the uncontroversial proposition that a court must consider the entire record; it does not state that the record from a first trial is considered part of the record at a second trial. The Trustee offers no authority, and the Court is not aware of any, for the proposition that subsequent trials in the same case incorporate the record from earlier trials. Moreover, contrary to the Trustee's urgings, the parties' stipulation to admit the Court's findings of

1  fact from the first trial is not a recognition of such legal authority. *See* (Doc. 468 at 2).

2        Accordingly, prior testimony from the first trial in this case was not automatically

3  admitted in the present trial. Because the Trustee never moved to admit the testimony

4  upon which he now seeks to rely, that testimony is inadmissible and the Court will not

5  consider it.

6        **B.**    **Traffic Volume Permitted by the Easement on Murphy Road**

7        The sole issue in this bench trial is whether the scope of the Trustee's easement on

8  Murphy Road permits the Trustee to use Murphy Road to carry the traffic generated by

9  an approximately 440 house subdivision on Section 16. For convenience, the Court will

10  refer to this level of traffic as the "Proposed Traffic." The Court incorporates its detailed

11  legal analysis and conclusions from its previous ruling on the parties' cross-motions for

12  summary judgment (Doc. 407), in which it concluded that the applicable legal test is

13  whether the Trustee's proposed use of the easement would "cause unreasonable damage

14  to the servient estate or interfere unreasonably with its enjoyment." (Doc. 407 at 17).

15        **1.**    **Definition of the Servient Estate**

16        As an initial matter, the Court notes that the parties are not clear as to the precise

17  portion of the Reservation constituting the servient estate in this case. At trial, the Court

18  asked counsel for both parties to define the servient estate. (Tr. 2/24/15 AM at 186-187;

19  Tr. 2/24/15 PM at 298). The Trustee defined the servient estate as "the easement," a

20  plainly incorrect statement of the law of easements. The Community vacillated on this

21  issue, defining the servient estate alternatively as "the surrounding area;" "the area

22  around the section;" and "at least District 5, at least the area surrounding Section 16." In

23  its post-trial briefing, the Community asserts that the servient estate "is the penumbra of

24  territory surrounding Section 16 and Murphy Road within the Reservation's District 5,

25  including the densely populated areas on Casa Blanca Road." (Doc. 470 at 4). The

26  Trustee's post-trial briefing indirectly suggests the servient estate extends up to five to

27  ten miles from Section 16. (Doc. 473-1 at 2 n.2); *but see* (*id.* at 4-5 & n.6).

28        Although the precise contours of the servient estate are unclear, the Court adopts

the Community's proposed definition and will assume that the servient estate includes, at minimum, the entirety of District 5. The Court finds that this definition of the servient estate favors the Community's position because it permits the Court to consider all of the Community's evidence and concerns relating to the use of Murphy Road, including the impacts to Casa Blanca Village, and it is appropriate here to err, if it all, in favor of the owner of the servient estate.

### 2.    Burden of Proof

At trial, the Trustee argued that the Court erred in its ruling on the motions for summary judgment when it placed the burden upon the Trustee to show that the Proposed Traffic was within the scope of the easement. (Tr. 2/24/15 AM at 182). The Trustee offered three cases in support of this argument, none of which actually supports placing the burden on the owner of the servient estate. *City of Scottsdale v. Thomas*, 753 P.2d 1207, 1207 (Ariz. Ct. App. 1988) (not discussing the issue of burden but only mentioning the burden of proof in describing an argument); *Paxson v. Glovitz*, 50 P.3d 420, 427 ¶ 37 (Ariz. Ct. App. 2002) (noting a lack of evidence but not discussing the burden); *Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837, 842 (8th Cir. 1975) (same).

In post-trial briefing, the Trustee offers two additional cases in which the courts placed the burden on the owner of the servient estate to prove that the easement was being overburdened. *See Weeks v. Wolf Creek Indus., Inc.*, 941 So. 2d 263, 271-72 (Ala. 2006) ("First, 'the owner of the servient estate [ordinarily] has the burden of proving overburdening because the servient owner has asserted overburdening as a cause of action or as a reply to a special defense of an easement when the purpose of the easement is not in dispute.'"); *Shooting Point, L.L.C. v. Wescoat*, 576 S.E.2d 497, 502 (Va. 2003) ("A party alleging that a particular use of an easement is unreasonably burdensome has the burden of proving his allegation."). Neither of these cases applies Arizona law, and even if the Court adopted their holdings, it would unfairly prejudice the Community to shift the burden to the Community after the conclusion of trial. For these reasons, the Court declines to revisit its prior conclusions and reaffirms that the Trustee bears the

1   burden to prove that the Proposed Traffic is a permissible use of the easement.[6]

2                    **3.      Quantitative Evidence of Traffic**

3          The Community argues that the Trustee has failed to meet his burden of proving

4   that the Proposed Traffic is a permissible use of the easement because the Trustee failed

5   to offer any specific estimates of traffic volume on any road. (Doc. 470 at 4, 6; Doc. 471

6   at 4-5). According to the Community, the Court's summary judgment ruling required the

7   Trustee to quantify the Proposed Traffic. (*Id.*)

8          The Trustee asserts there is evidence of specific estimates of traffic volume on

9   Murphy Road contained within Exhibit 920, a Community memorandum containing the

10  sentence that traffic engineers estimate peak hourly traffic using an assumption of ten

11  trips per house per day. (Doc. 468 at 3). Aside from the reliability concerns that arise

12  from using a single statement in a 2004 memorandum as a basis for calculating traffic

13  volumes, the Trustee's argument fails because this statement by itself is not competent

14  evidence as to the traffic volume on Murphy Road or surrounding roads.

15         Although the Trustee asserts that multiplying the 440 proposed houses by ten trips

16  per house per day yields approximately 4,400 daily trips by future Section 16 residents,

17  the evidence does not support this conclusion. There is no evidence in the record that this

18  assumption regarding peak hourly traffic necessarily translates into all ten daily trips by a

19  house being on the same road, nor is there evidence of how any residents' daily trips

20  would be distributed among the roadways surrounding Section 16. There is also no

21  evidence explaining how this assumption, which is identified as concerning "peak hourly

22  traffic," relates to the total daily traffic on Murphy Road. In sum, the statement that

23  traffic engineers estimate peak hourly traffic using an assumption of ten trips per house

24  per day utterly fails to quantify the level of traffic on either Murphy Road or surrounding

25  roads.

26  _____

27         [6] In any event, this issue is irrelevant because the Court ultimately concludes that
    the Trustee has proved by a preponderance of the evidence that his proposed use of
28  Murphy Road will not unreasonably damage the servient estate or unreasonably interfere
    with the Community's enjoyment of the servient estate.

The Trustee was not required to quantify the level of traffic on Murphy Road, however. Under the applicable law, the Trustee merely must show that the Proposed Traffic will not cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment. Although a traffic analysis showing projected traffic on Murphy Road and surrounding roads may be evidence supporting this showing, nothing in this legal standard requires such a quantitative analysis.

### 4.      Traffic on Casa Blanca Road

The crux of the Community's concern regarding the Trustee's proposed use of Murphy Road is the potential for cut-through traffic across Casa Blanca Road to I-10. The Court concludes that this concern, although perhaps warranted, ultimately does not support a finding that the Trustee's proposed use of Murphy Road will unreasonably burden the servient estate.

First, the present use of Casa Blanca Road by both members and non-members of the Community is of such a magnitude that the Proposed Traffic will not *unreasonably* impose a burden on the servient estate. As a paved, public road connecting not only two busy highways (I-10 and SR 347), but also different areas of the Reservation, Casa Blanca Road is a regionally significant road. The road is already surrounded by high traffic volumes, including 65,000 vehicles per day along the Casa Blanca Road/I-10/SR 587 interchange. Moreover, cut-through traffic along Casa Blanca Road already exists. The addition of a residential development located a few miles from Casa Blanca Road does not unreasonably increase the traffic along Casa Blanca Road because a developed Section 16 is not out-of-place among the other nearby developed areas, including Maricopa.

Second, although the Community argues that cut-through traffic is relevant to determining the burden imposed upon a servient estate, (Doc. 470 at 7 n.7), the Community misapprehends the issue for trial. The Community has maintained that it is the act of *paving* Murphy Road that will cause cut-through traffic, and the trial evidence supports this assertion. *See* (Tr. 2/23/15 AM at 92-93). But the Court already decided the

1    issue of paving in its ruling on the parties' cross-motions for summary judgment.[7] *See*

2    (Doc. 407 at 20). Accordingly, the issue of cut-through traffic is not relevant to the issue

3    for trial and the Court finds it does not weigh in favor of the Community.[8]

4         Third, although the issue of whether the Proposed Traffic will unreasonably

5    burden the servient estate by traversing Casa Blanca Road is relevant, the Court finds that

6    the Trustee has shown any burden will be reasonable. The Community has stated, in its

7    primary planning guide for development within the Reservation, that it could construct up

8    to 10,217 homes in an area just north of and adjacent to Casa Blanca Road. Although the

9    Community's plans are in the nature of visions and are not concrete,[9] the Community's

---

[7] To the extent that there was evidence produced at trial related to the issue of paving Murphy Road, it supports the Court's prior ruling and the Court reaffirms that ruling.

[8] Even if this issue were relevant, the evidence at trial showed that even paving Murphy Road is insufficient to cause Casa Blanca Road to be a desirable route for Maricopa to Phoenix commuters. Testimony showed that the low speed limit on Casa Blanca Road, coupled with the schools and other buildings located along that road, deters would-be commuters. *See* (Tr. 2/23/15 AM at 92:15-25).

Moreover, although the Community cites two cases for the proposition that increased third-party traffic (e.g., cut-through traffic) is relevant to the burden on a servient estate, these cases are not on point. *Christensen v. City of Pocatello*, 124 P.3d 1008 (Idaho 2005) involved an easement holder's intent to expand a public walking and biking path over an easement originally created for private access between two properties. The Supreme Court of Idaho rejected the easement holder's attempt at expansion because an easement holder may not use the easement to benefit parcels other than the dominant estate. 124 P.3d at 1013. Here, the Trustee does not intend to use Murphy Road to benefit parcels other than Section 16; any third-party use of Murphy Road is entirely unauthorized by the Trustee. For these same reasons, the Community's reliance upon *Cheatham v. Melton*, 593 S.W.2d 900 (Mo. Ct. App. 1980) is misplaced. That case involved an easement holder's attempt to expand an easement originally created to serve as a private driveway for two residents. 593 S.W.2d at 902. The Missouri Court of Appeals rejected the easement holder's attempt to use the easement in conjunction with a newly-constructed roadway to serve properties beyond the dominant estate. *Id.* at 903-04.

Finally, the Trustee cites *Bradshaw v. Enterprise Realty, Inc.*, 115 So. 3d 922 (Ala. Civ. App. 2012) for the proposition that the misuse of an easement by trespassers does not overburden the easement. (Doc. 473-1 at 5 n.7). But no evidence was presented at trial that any of the would-be commuters on Murphy Road would be *trespassers*. Thus, *Bradshaw*, although perhaps helpful to the Trustee's position in general, is not particularly on-point and does not support the proposition that the lawful use by third-parties of an easement is relevant to determining the burden on a servient estate.

[9] The Court acknowledges the Community's argument that the District 5 Master Plan (Ex. 291) is a visionary document containing the conflicting voices of all District 5

expression of its potential desires for the land surrounding Casa Blanca Road is relevant to determining whether additional residential traffic is incongruent with the Community's use of the lands surrounding Casa Blanca Road. Casa Blanca Village already exists as a residential area, and the Community's vision for additional residential development in this area shows that residential traffic (such as the Proposed Traffic) is congruent with the Community's intended use of Casa Blanca Road.[10]

Nonetheless, the Community argues that the Proposed Traffic will "pose grave risks" to the children and elderly in Casa Blanca Village. (Doc. 470 at 7). This attempt at an appeal to emotion is unfounded because the Community has already established adequate safeguards to protect the residents of Casa Blanca Village through the use of very low speed limits. The Community cites only to testimony showing the existence of schools, a senior center, and other community gathering places, as well as to bare assertions that increased traffic is a concern and a "problem lies in the speed and what's in that area." (*Id.* at 7:8-12). The Community never explains how an increased number of vehicles will increase the risk to its members, nor does the Community show that its setting of speed limits will be insufficient.

Finally, the cases cited by the Community are inapposite. *Davis v. Bruk*, 411 A.2d 660 (Me. 1980) applied Maine caselaw from 1921 that held that an easement could not be paved. 411 A.2d at 666. Paving Murphy Road is not an issue for trial, and the Court has already reached the opposite conclusion based upon its interpretation of Arizona law. *See* (Doc. 407 at 20). *Rupert v. Gunter*, 640 P.2d 36 (Wash. Ct. App. 1982) held that the owner of a servient estate had the right to install gates on the easement to prevent

---

members. *See* (Doc. 470 at 6). However, this document is still probative and the governing body of the Community adopted it as the "primary planning guide for the development and management of Community and allotted trust lands within the exterior boundaries of the Gila River Indian Reservation." (Doc. 336). Moreover, the Community did not offer more robust evidence as to its development plans. The Court would abuse its discretion if it ignored the only competent evidence on point.

[10] Indeed, the Community's goal with the proposed Seed Farm Road interchange is to keep traffic away from residential areas while still taking advantage of commercial opportunities in the south of District 5.

members of the public from speeding along the road. 640 P.2d at 39. Here, unlike *Rupert*, there is no evidence of actual speeding nor is there any evidence that the Community's speed limits along Casa Blanca Road are insufficient. Furthermore, the Trustee's easement does not extend to Casa Blanca Road and these cases do not hold that the owner of a servient estate can restrict the use of an easement because of alleged misuse of property other than the easement. Accordingly, the Trustee's proposed use of Murphy Road will not unreasonably burden the servient estate or interfere unreasonably with its enjoyment because of effects involving Casa Blanca Road.

### 5.       Property Adjacent to Section 16

The Proposed Traffic associated with development of Section 16 will not unreasonably burden the lands immediately surrounding Section 16. Because the land near Section 16 is either agricultural or undeveloped, the impacts from any additional vehicles on Murphy Road will be insignificant. The Community's plans for a possible interchange between Seed Farm Road (which borders Section 16 under the name of Smith-Enke Road) and I-10, with perhaps 22,000 vehicles per day using the interchange, (Ex. 291 at G-0005992), shows that the Community's planned use of the southern lands in District 5 is such that the Proposed Traffic will not unreasonably burden the roadways.

### 6.       Irrigation

The Proposed Traffic will burden irrigation operators who presently cross Murphy Road.[11] The increased volume of traffic may result in operators having to wait a few minutes to cross the road, as well as delays in opening and closing fences. But these delays are minimal and numerous other canals cross paved roadways within the Reservation, including canals crossing I-10. Thus, this burden is not unreasonable.

Aside from the issue of delays due to traffic, the Community also contends that the irrigation network will be unreasonably damaged through vandalism, pollution,

---

[11] Irrigation *owners* will not be significantly burdened because although safety improvements may need to be made, the Trustee will bear the expense of reworking all irrigation crossings and upgrading irrigation equipment as necessary to obtain irrigation district approval.

alterations, and safety issues. (Doc. 470 at 7). This argument fails because, as with the Community's argument concerning cut-through traffic, it relates to the paving of Murphy Road and not the number of vehicles traveling on Murphy Road. Regardless, even if the Court considers the merits of this argument, it fails. There is no evidence in the record of a threat of vandalism or pollution if the Proposed Traffic uses Murphy Road. The record shows that any alterations to the irrigation canals necessary to pave Murphy Road will be the expense of the Trustee and that the irrigation district must approve any changes before the Trustee will be permitted to improve the roadway. Any safety issues will be similarly addressed at the Trustee's expense, including the possible installation of fences as necessary to prevent trespassers. Finally, as the Court has noted, the delay to irrigation operators is minimal and irrigation operators must already contend with canals intersecting significant roadways such as I-10. For these reasons, the Trustee's proposed use of Murphy Road does not unreasonably burden the irrigation network within the Reservation.

### 7.    Public Services

At trial, the Community presented evidence that residential development of Section 16 may increase the burden upon the Community's public services, such as police and fire services.[12] The Community argues that this constitutes an unreasonable burden upon the Community. (Doc. 470 at 7; Doc. 471 at 5 n.7). This argument fails most simply because it conflates the governmental ownership of land with the government's role in providing public services to its citizens. The provision of police and fire services is a function of the Community's role as the government for the Reservation, and is

---

[12] The Court finds the credibility of Edward Alameda, a former employee of the Gila River Police Department, to be impaired because of the witness's combative nature and evident insistence upon testifying solely in a light favorable to the Community. *See, e.g.*, (Tr. 2/24/15 AM at 106-07). Naturally, the tone and cadence of Mr. Alameda's live testimony are not reflected in the trial transcript.

Mr. Alameda testified at trial that the Gila River Police Department is obligated to respond to calls for services within Section 16. (Tr. 2/24/15 AM at 266). This contradicts the Court's prior finding at the first trial that Section 16 is not within the Gila River Police Department's jurisdiction. (Doc. 407 at 15). For the reasons stated above with respect to Mr. Alameda's credibility, the Court reaffirms its prior finding.

1    distinct from the Community's role as landowner. The Community's provision of these

2    services would continue even if the Community owned none of the land within the

3    Reservation. For example, municipalities offer police and fire protection even when the

4    municipality itself owns no land within its boundaries.

5         Nevertheless, the Community argues that burdens upon public services represent

6    an "overburdening" of the Community's resources and thus an unreasonable interference

7    with the Community's enjoyment of the Reservation. (Doc. 471 at 5 n.7). This argument

8    misstates the appropriate measure of burden upon the servient estate. Any inquiry into the

9    Community's enjoyment of the servient estate must concern enjoyment of the *land*. For

10   example, the owner of a dominant estate is not entitled to develop an easement so as to

11   deprive the owner of the servient estate from accessing the servient estate. This is

12   because the use of an easement may not unreasonably interfere with the ability of the

13   owner of the servient estate to enjoy his property. The inquiry is not whether the use of

14   the easement causes the owner of the servient estate to incur additional expense in its

15   capacity as a governmental entity. The latter obligations exist regardless of whether the

16   owner of the servient estate is a landowner.

17        To hold otherwise would determine the scope of an easement not by the

18   circumstances surrounding its creation, but by whether the present owner of the servient

19   estate is a governmental entity with public service obligations. This does not comport

20   with the law of easements, and the Court rejects the Community's argument.[13]

21

22

23

24

25

_____

26        [13] The Community contends that the Court has "repeatedly recognized" that the
     burdens on the Community's public services are relevant to measuring the Community's
27   enjoyment of the servient estate. (Doc. 470 at 7 n.10). Although the Court has at times
     discussed the burden upon public services, *see, e.g.*, (Doc. 407 at 17), the Court has never
28   held that this burden is relevant to the issue for trial. To the extent the Court may have
     implied to the contrary, the Court disavows those remarks.

1

**IV.     Conclusion**

2      For the foregoing reasons, the Court concludes that the Proposed Traffic will not

3  unreasonably burden the servient estate or unreasonably interfere with the Community's

4  enjoyment of the servient estate.

5      Accordingly,

6      **IT IS DECLARED** that the scope of the easement along Murphy Road permits

7  the Trustee to: (1) improve Murphy Road into a two-lane 40-foot wide paved roadway;

8  (2) install underground utilities beneath Murphy Road from the southern boundary of the

9  Reservation to the southeast corner of Section 16; and (3) use Murphy Road to carry the

10  traffic associated with a 440-house development on Section 16.

11      **IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment in favor

12  of the Trustee and against the Community consistent with these Findings of Fact and

13  Conclusions of Law.

14      Dated this 31st day of March, 2015.

15

16

17

18      James A. Teilborg
        Senior United States District Judge

19

20

21

22

23

24

25

26

27

28